

1 | DONGXIAO YUE
2777 ALVARADO ST., SUITE C
2 | SAN LEANDRO, CA 94577
3 | Telephone:     (510) 396-0012
Facsimile:     (510) 291-2237
4 | E-Mail:     ydx@netbula.com

5 | *Pro Se*

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

| DONGXIAO YUE, | Case No. C07-05850-SI |
| --- | --- |
| Plaintiff, | |
| v. | |
| STORAGE TECHNOLOGY CORPORATION, a Delaware corporation; SUN MICROSYSTEMS Inc., a Delaware corporation; Michael Melnick, an individual; Julie DeCecco, an individual; Michael P. Abramovitz, an individual; Lisa K. Rady, an individual; Jonathan Schwartz, an individual; and DOES 1-1000, inclusive, | |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

22 | **LETTER TO HONORABLE MARTIN J. JENKINS
REGARDING MOTION FOR SUMMARY JUDGMENT AND RELATING CASES**

23 | **(5 pages)**

24

25

26

27

28

Case No. C07-05850-SI

December 17, 2007

Dear Honorable Martin J. Jenkins,

I am writing this letter to make a record on several issues. As the owner of the relevant copyrights and the plaintiff of the *Yue v. StorageTek* case (C07-05850-SI), my interest will be affected by the decision in the C06-07391-MJJ case. Though the hearing of my motion to intervene and join as plaintiff in the C06-07391-MJJ case was vacated by the *ex parte*-on-its-face order drafted by Mr. Pulgram, I have a right to make a record, to assist the Court in ascertaining the truth, and to preserve my constitutionally protected property rights in the lawsuits and in my intellectual production.

In the *Netbula v. BindView* case, I drafted the oppositions to BindView defendants' 12(b)(6) and 12(b)(2) motions to dismiss a few days before the due date. Your Honor considered the arguments presented through counsel and denied BindView defendants' motions as mischaracterizing the claims. Here, I hope that my direct voice will be heard, as a witness for the non-moving party in the summary judgment proceeding of the C06-07391 case and *pro se* plaintiff for the C07-05850-SI case.

## A. The Issue of Apparent Bias and Antagonism

On August 28, 2007, I was informed that a magistrate judge stated that the blog I wrote offended the judges (including Your Honor) and as a result an adverse ruling against Netbula was probably already in place. Three days later, Your Honor signed the order granting BindView and Symantec's motion for summary judgment on copyright, fraud and breach of contract claims.

On November 14, 2007, I wrote a letter to the chief judge of the Ninth Circuit regarding the above situation. On November 18, 2007, I sent a letter to Congressman James Sensenbrenner – who led the congressional investigation of Judge Manuel Real -- about the same.

Under Canons 3A(3) and 3A(4) of the Code of Conduct for United States Judges, "[a] judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers" and "should accord to every person who is legally interested in a proceeding, … full right to be heard according to law." But Your Honor showed a strong animosity towards me in the two hearings I was present. You ordered that I cannot file papers and said you were going to have me taken out if I don't be quiet. Your Honor also coached Mr. Laurence Pulgram to make arguments against me at the November 20, 2007 hearing.

On December 14, 2007, Your Honor granted Mr. Jedediah Wakefield's request to extend the time to answer the first amended complaint in the C07-05850-SI case, while forbade me to raise objections. I am the *pro se* plaintiff; Mr. Wakefield was not

even an attorney of record for defendants of the C07-05850-SI case, which is still presided over by Judge Illston as of today.

I previously wrote to Your Honor that once the "cease and desist" order is lifted, I will file a formal response to Sun's motion to relate the cases. But Your Honor made no indication that the "cease and desist" order was vacated, and Your Honor unilaterally granted Mr. Wakefield's request for extension in filing an answer in the C07-05850-SI case and told him that no default will be taken.

The bias is apparent.

Under such circumstances, Canon 3C(1)(a) of the Code of Conduct mandates disqualification: "A judge **shall** disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned."

## B. Facts in the C06-07391-MJJ Summary Judgment Record

There are many dispositive facts in Netbula's Opposition and my declaration, which won't be found in defendants' motion for summary judgment or the stipulated facts – defendants even refused to stipulate to the fact that they sent Netbula the purchase orders.

The following pieces of evidence are all before the Court in Netbula's Opposition and my declaration.

## 1. 1000-copy license purchased in 2000 and 1000-copy license purchased in 2004

### 1) *The license agreement*

As Ms. Brillet stated at the hearing, the license grant's "must pay" clause refers to Exhibit C, which has the following terms:

> *STORAGETEK* shall pay NETBULA ... for the right to distribute up to *1000* units of software containing the Supporting Programs... Additional licenses purchased are subject to the terms and conditions of this Agreement.

Exhibit C to the 2000 Agreement treats the SDK and the limited distribution license in the same way – StorageTek must purchase licenses for the copies to be made or distributed. In Michael Melnick[1]'s own words, it is a "prepay" agreement. Yue Decl, ¶ 65. StorageTek only purchased a total of 2000 licenses to install the runtime[2]. Yue Decl, ¶ 62.

---

[1] Michael Melnick negotiated, drafted and signed the 2000 and 2004 Agreements on behalf of StorageTek.

[2] Therefore, when StorageTek made 2000 copies, it used up the licenses, all additional copies were made or distributed without licenses. Defendants have the burden to show they have a license to make a copy. See *Wall Data v. Los Angeles Cty. Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006).

*2) Admissions by party-opponent on the limited distribution license*

- Michael Melnick, who negotiated, drafted and signed both the 2000 and 2004 Agreements on behalf of StorageTek, responded to Netbula's audit request: "The license count you request is 107, this leaves us the rights to distribute 893." Yue Decl, ¶ 44.

- Michael Melnick wrote in an internal email: "The number that Holly has provided and thought it may be low causes quite a problem for you. We have only made 2 purchases for the rights to distribute a total of 2000 licenses." Yue Decl, ¶ 62.

- Michael Melnick: "Can you give me an update of how many Netbula RPC licenses we have distributed? We need to make sure we have not exceeded what we have been licensed for." Yue Decl, ¶ 62.

- Lisa Rady – the program manager of the LibAttach software – wrote in an email: "I have a CD in my hand called 'Netbula ONC RPC for Win32 Development Toolkit', licensed to StorageTek (1605) 8 Developers 1000 runtime." Yue Decl, ¶ 49.

- Lisa Rady: "As you can see we have exceeded our 1000 distributions of NetBula, so that is one issue" Yue Decl, ¶ 50.

- Michael Abramovitz (one of the developers): FILED UNDER SEAL. Yue Decl, ¶ 68.

*3) The CD label and software say it was a 1000-copy license*

- Lisa Rady: "I have a CD in my hand called "Netbula ONC RPC for Win32 Development Toolkit", licensed to StorageTek (1605) 8 Developers 1000 runtime…"

- Yue Declaration: I always put license quantity and invoice number on CD label.

- Yue Declaration: I embedded license quantity and invoice number in software.

- Yue Declaration: Software displays the following information on computer screen: "Licensee: StorageTek, 1000 machine runtime license (s10302)"

*4) StorageTek admitted that the licenses must be pre-paid and the agreement was not a royalty-type agreement*

- Michael Melnick to Netbula: "We would love to pay you on a royalty 'as we use basis' but when this was requested we were reminded that this was

not your model and **we must prepay**." Yue Decl, ¶ 65.

● Michael Melnick: "Prepaid agreement is one where I'm buying a block of licenses whether I use them or not. ... I basically have to pay in advance." Ms. Brillet: "And who made that requirement?" Melnick: "Mr. Yue". Melnick Deposition. So, Yue set the terms.

● Sun StorageTek Legal Department: "StorageTek systems are set up to track royalties on a going-forward basis, not on a **pre-paid** basis. **Mike Melnick suggested that the parties enter into a straight royalty-type agreement, but Netbula declined to do so**..." Yue Decl, ¶ 75.

● Lisa Rady: "It has been determined that we need to purchase a new SDK and 1000 more distributions of Netbula..."

### 2. The 2000 Agreement's Platform Restrictions

● Michael Melnick to Netbula: "No disagreement with the [sic] that the original agreement was for (Windows NT/98/95 only)." Yue Decl, ¶ 67.

● Michael Melnick wrote in an internal email: "The agreement is specific to platform (Win NT and 95/98 platforms) types of Netbula software (PowerRPC SDK)." Yue Decl, ¶ 49.

● Lisa Rady: "The CD you gave me was for Windows NT/95/98." Yue Decl, ¶ 50.

● Anton Vatcky to Netbula: "We at StorageTek currently use the NT version of PowerRPC in our product called REELs...A separate licensing agreement would follow up if StorageTek determines that we will be able to sell our REEL software product for Win2K platforms." Yue Decl, ¶ 38.

● License agreement, Exhibit B: "Pmapsvc.exe    The portmapper service for Windows NT"

● First Amended Complaint at ¶ 33, email from Keith Oliver.

● SDK limits application developed to Windows NT/98/95. Yue Decl.

### C. Newly Made Arguments by Defendants

Mr. Pulgram claimed that "Windows NT" for "Pmapsvc.exe" in Exhibit B of the 2000 Agreement was not a platform restriction. His main point was that the 2004 Agreements says the same. But, in a 2003 agreement attached as Exhibit 17 to Yue Declaration, page A0069, it says: "Pmapsvc.exe The Portmapper service for Windows NT & Windows XP".

The 2004 Netbula-StorageTek Agreement was drafted by Michael Melnick to

cover Windows 2003, but he forgot to change the platforms in Exhibit B. See Exhibit 22 to Yue Declaration for the redlined version of the agreement Mr. Melnick drafted[3]. Literally, the 2004 Agreement restricted Pmapsvc.exe to Windows NT also. To interpret the 2004 Agreement as covering Windows 2003, defendants had to rely on the SDK portion of the 2004 Agreement, which granted development rights for Windows 2003.

Mr. Pulgram also asked why "Pmapsvc.exe" was restricted to "Windows NT" instead of "Windows NT/98/95". The reason is simple. The "Pmapsvc.exe" was designed and licensed for Windows NT only – it could not even function under Windows 98/95. Mr. Pulgram also said that Win32 means 32 bit Windows operating systems – he was no programmer and his educated guess was wrong.

Most of those later declarations submitted by defendants are plain hearsay and not subject to any cross-examination. I have requested Fenwick lawyers to produce the supporting records for the conforming e-signatures for those declarations and they ignored my requests.

Both the 2000 and 2004 agreements expressly stated that the agreements were not assignable without the written consent of both parties. The parties never attempted to have a written assignment made. Immediately after I received StorageTek's usage reports in July 2005, I raised most of the same issues in the C06-07391-MJJ lawsuit to defendants. Yue Decl, ¶ 66. I basically told defendants that they already infringed the copyright. There is no gotcha. Back in 2004, Melnick stated in an internal email, the situation concerned him greatly. Yue Decl, at ¶49.

Sincerely,

Dongxiao Yue
Witness, Intervenor and Counter-defendant -- Netbula v. StorageTek (C06-07391-MJJ);
Plaintiff -- Yue v. StorageTek (C07-05850-SI)

---

[3] Mr. Melnick made a note about Exhibit B in the draft of the 2004 Agreement, but I did not notice the platform issue when approving the agreement.