1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  JEDEDIAH WAKEFIELD (CSB NO. 178058)
   *jwakefield@fenwick.com*
3  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
4  FENWICK & WEST LLP
   555 California Street, Suite 1200
5  San Francisco, CA 94104
   Telephone: (415) 875-2300
6  Facsimile: (415) 281-1350

7  Attorneys for Named Defendants
   SUN MICROSYSTEMS, INC.,
8  MICHAEL MELNICK, JULIE DECECCO,
   MICHAEL P. ABRAMOVITZ, LISA K. RADY,
9  JONATHAN SCHWARTZ, CHORDIANT
   SOFTWARE, INC., DEREK P. WITTE,
10 STEVEN R. SPRINGSTEEL, and OLIVER WILSON

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14 DONGXIAO YUE,                          Case No. C-07-05850-JW and
                                          Case No. C-08-00019-JW
15            Plaintiff,
   v.
16                                        **SUPPLEMENTAL DECLARATION OF**
   STORAGE TECHNOLOGY                     **JEDEDIAH WAKEFIELD IN**
17 CORPORATION, a Delaware corporation;   **OPPOSITION TO MOTION TO**
   SUN MICROSYSTEMS, INC., a Delaware     **DISQUALIFY DEFENSE COUNSEL**
18 corporation; MICHAEL MELNICK, an
   individual; JULIE DECECCO, an
19 individual; MICHAEL P. ABRAMOVITZ,     Date:      June 30, 2008
   an individual; LISA K. RADY, an        Time:      9:00 a.m.
20 individual; JONATHAN SCHWARTZ, an      Courtroom: 8, 4th Floor
   individual; and DOES 1-1000, inclusive, Judge:    Honorable James Ware
21            Defendants.

22 DONGXIAO YUE,

23            Plaintiff,
   v.
24
   CHORDIANT SOFTWARE, INC., a
25 Delaware corporation; DEREK P. WITTE,
   an individual; STEVEN R.
26 SPRINGSTEEL, an individual; and
   OLIVER WILSON, an individual,
27            Defendants.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

I, Jedediah Wakefield, declare as follows:

1. I am an attorney admitted to practice before this Court, and I am a partner at the law firm of Fenwick & West LLP. I have personal knowledge of the facts set forth in this declaration, and if called to do so I could and would testify competently to the same.

2. I previously submitted a Declarations in Opposition to Plaintiff's Motiosn to Disqualify Defense Counsel in the *Yue v. Storage Technology* ("STK I") and *Yue v. Chordiant* cases. I submit this Supplemental Declaration to respond to allegations in Plaintiff's Consolidated Reply.

**The *Netbula v. Distinct* Trademark Case and Distinct's False Advertising Counterclaims**

3. Attached hereto as **Exhibit A** is a copy of the Docket in *Netbula v. Distinct,* Case No. C-02-1253-JL (N.D. Cal.).

4. In his Reply, Plaintiff argues that the *Netbula v. Distinct* case "involved copyright dispute." Consolidated Reply at 5:15-27. In support of this assertion, Plaintiff cites a document request Fenwick served in the related *Netbula, LLC v. BindView Development Corp.*, Case No. 06-0711-MJJ-WDB (N.D. Cal.) *("BindView")*, which referred to Paragraph 13 of Distinct's Supplemental Counterclaims. However, that paragraph in Distinct's counterclaims did not include an allegation of copyright infringement. Rather, it referred to a copyright dispute that Distinct and Netbula had over 2 years before *Netbula v. Distinct* was ever filed. All records I have been able to obtain from the Court reflect that neither Netbula nor Distinct asserted a claim for copyright infringement in the *Netbula v. Distinct* case. A true and correct copy of Distinct's supplemental counterclaims is attached hereto as **Exhibit B**.

5. According to the Supplemental Counterclaims, in its earlier dispute with Netbula, Distinct had sent a letter accusing Netbula of infringing Distinct's copyright in connection with Netbula's "JavaRPC" product—a product that is *not* at issue in any of Netbula's claims against Sun or Chordiant, and was not at issue in the *Netbula v. Distinct* lawsuit. According to Distinct's Supplemental Counterclaims, Netbula responded to Distinct's assertion of copyright infringement in an October 1999 letter by denying any wrongdoing and stating "we will not tolerate any unlawful activity that was designed to destroy our hard work, our intellectual property and our

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 reputation." *See* ¶12 of Exhibit B. The records and pleadings I have seen from the Court's file

2 do not reflect that Distinct ever pursued the copyright issue further after that exchange of letters.

3 However, over two years later, when Netbula filed its trademark complaint against Distinct,

4 Distinct alleged that Netbula cited the October 1999 letter on its website when discussing the

5 2002 trademark case. Distinct filed supplemental counterclaims for false advertising, pointing

6 out that the letter was about the earlier, unrelated copyright dispute that was not part of the

7 *Netbula v. Distinct* trademark claims. *Id.*, ¶13. As Distinct put it at paragraph 13 of its

8 Supplemental Counterclaims:

> Netbula does not explain that it sent the October 1999 letter two years
> earlier *in response to a demand letter* that Distinct sent to Netbula
> regarding Netbula's infringing activity. The letter was Netbula's attempt
> to defend itself when accused of copyright infringement and has no
> relationship with the current dispute whatsoever. By referencing the
> October 1999 letter at the beginning of the discussion of the current
> lawsuit, Netbula wrongly misleads the public into believing that Netbula
> complained about Distinct's allegedly infringing activities in 1999, and
> that Distinct ignored Netbula's complaint for over two years. Moreover,
> Netbula's inclusion of the information in the October 1999 letter in its
> posting about the current lawsuit will cause the public to conclude that
> Netbula directly contacted Distinct prior to filing the lawsuit regarding the
> trademark issues, which is not true.

17 *Id.* (emphasis in original).

18       6. After the ENE, Distinct was granted leave to file its Supplemental Counterclaims,

19 despite Netbula's objection that the claims were "futile." Attached hereto as **Exhibit C** is true

20 and correct copy of the court's Order granting Distinct leave to file its Supplemental

21 Counterclaims. According to the Docket, the case was dismissed shortly thereafter.

22       7. In his Reply, Dr. Yue says that I examined him "at great length" concerning the

23 Netbula v. Distinct case in his deposition in the *BindView* case. In fact, my examination of Dr.

24 Yue comprises roughly 12 out of over 880 pages of transcripts, or about 10 minutes of

25 examination out of 4 days for his deposition. My questions pertained to the 1999 exchange of

26 letters between Netbula and Distinct, not about the trademark suit, filed years later, that went to

27 ENE. In particular, I asked about Yue's letter, in which he claimed that similarities between his

28 product and Distinct's product resulted from both of them being based on Sun Microsystems

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  code. This was relevant in the *Bindview* case, because the PowerRPC product at issue in that case

2  was also based on Sun code, and there were serious questions about what code Netbula actually

3  owned. Relevant excerpts from those depositions, including all questions I asked about disputes

4  with Distinct, are attached hereto as **Exhibit D.** Although certain transcript pages are labeled as

5  HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, in fact these pages were not

6  designated as confidential or highly confidential under the Protective Order in that case

7      8.      According to the Docket in the *Netbula v. Distinct* case, Neil Smith, now of

8  Sheppard Mullin, represented Netbula the *Distinct* case, in which he attended the ENE at

9  Fenwick's offices. Mr. Smith also represented Netbula and in the *BindView* case, in which he

10  signed the complaint and then personally, exchanged correspondence and participated in

11  negotiations with Laurence Pulgram and me. Later, after Netbula claimed that expenses for Mr.

12  Smith's activities were part of Netbula's "fraud" damages, Mr. Smith had his deposition taken on

13  two occasions at Fenwick's offices in that case.

14  **Confidentiality of Early Neutral Evaluation**

15      9.      The Northern District's ADR Local Rules in effect in 2002 imposed

16  confidentiality on all participants in ENE proceedings, including evaluators. ADR Local Rule

17  5-12(a) required evaluators to treat as "confidential information" anything that happened or was

18  said, any position taken, and any view of the merits of the case formed by any participant in

19  connection with any ENE session. It further provided that "'confidential information' shall not

20  be: (1) disclosed to anyone not involved in the litigation; (2) disclosed to the assigned judge; or

21  (3) used for any purpose, including impeachment, in any pending or future proceeding in this

22  court." A true and correct copy of the Court's ADR Local Rules, obtained from the 2002 Revised

23  Edition of the *California Rules of Court, Federal*, published by West Group, is attached hereto as

24  **Exhibit E**.

25      10.      As with the ADR Local Rules in effect today, in 2002 ADR Local Rule 5-12(b)

26  provided only limited exceptions to this confidentiality requirement, as follows:

27          **Limited Exceptions to Confidentiality.** This rule does not
          prohibit: (1) disclosures as may be stipulated by all parties and the
28          evaluator; (2) a report to or an inquiry by the ADR Magistrate

SUPPLEMENTAL DECLARATION OF
JEDEDIAH WAKEFIELD IN OPPOSITION          -4-          CASE NO. C-07-05850-JW and
TO MOTION FOR DISQUALIFICATION                              CASE NO. C-08-00019-JW

Judge pursuant to ADR L.R. 2-4(a) regarding a possible violation of the ADR Local Rules; (3) the evaluator from discussing the ENE session with the court's ADR staff, who shall maintain the confidentiality of the ENE session; (4) any participant or the evaluator from responding to an appropriate request for information duly made by persons authorized by the court to monitor or evaluate the court's ADR program in accordance with ADR L.R. 2-6; or (5) disclosures as or otherwise required by law.

**Prejudice to Defendants**

11.     According to Fenwick time records, between July 2007 and March 2008, Fenwick attorneys and paralegals spent over 1,600 hours on the *Netbula, LLC v. Storage Technology Corp.*, Case No. 06-07391-JW (N.D. Cal.) ("*STK I*") and this case ("*STK II*"). During this time, Fenwick attorneys analyzed voluminous documentation, interviewed witnesses and prepared for depositions, took Dr. Yue's deposition, and conducted extensive legal research and analysis, culminating in the successful summary judgment motion on Netbula's copyright claims. Over the life of the copyright cases Fenwick has defended against Netbula and Yue—cases the Court has deemed to be related—Fenwick's records indicate its attorneys and paralegals have spent over 8,000 hours. The have worked closely with technical experts and taken expert discovery. They understand and are familiar with the technical nature of Netbula's software, the operations of his business, his use of assumed names in his business operations, the history of his copyright registrations, and the details of Plaintiff's licensing scheme. *Id.*

**Vonnah Brillet's Declaration**

12.     On May 27, 2008, after reviewing her declaration submitted in support of Plaintiff's disqualification, motion, Vonnah Brillet sent me an email in which she admitted: "I could have worded it differently to avoid any confusion." A true and correct copy of Ms. Brillet's May 27, 2008 email is attached hereto as **Exhibit F**.

**Yue's Declaration**

13.     Dr. Yue claims that Mr. Pulgram advised Judge Jenkins during an October 31, 2007 conference call—which Dr. Yue did not attend—to exclude Dr. Yue from the conference. Reply at 12:14-15. I was present during that call, as was Vonnah Brillet, who was counsel for

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Netbula at the time. I do not recall any "advice" by anyone to exclude Dr. Yue during the call. Ms. Brillet's declaration also does not attest to any such advice. The call concerned various administrative matters in *STK I*, and at the time Dr. Yue had not been granted (and was never thereafter granted) leave to intervene in the case. Netbula was still Plaintiff, and its lawyer was on the call, presumably representing its interests. At no time did Ms. Brillet object or otherwise request that Dr. Yue be invited to participate in the call.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 3, 2008                                    /s/ JEDEDIAH WAKEFIELD
                                                        Jedediah Wakefield

25689/00405/LIT/1286107.3

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT A


# U.S. District Court
# California Northern District (San Francisco)
# CIVIL DOCKET FOR CASE #: 3:02-cv-01253

Netbula, LLC v. Distinct Corporation
Assigned to: Magistrate Judge James Larson
Cause: 15:44 Trademark Infringement

Date Filed: 03/13/2002
Date Terminated: 06/02/2003
Jury Demand: None
Nature of Suit: 840 Trademark
Jurisdiction: Federal Question

## Plaintiff

**Netbula, LLC**                    represented by **Jin H. Kim**
Howard Rice Nemerovski Canady
Falk
Three Embarcadero Center 7th
Floor
San Francisco, CA 94111-4065
415-434-1600
*LEAD*
*ATTORNEY*
*ATTORNEY*
*TO BE*
*NOTICED*

**Neil Arthur Smith**
Sheppard, Mullin, Richter &
Hampton LLP
4 Embarcadero Center
17th Floor
San Francisco, Ca 94111-4106
415-434-9100
Fax: 415-434-3947
Email: nsmith@sheppardmullin.com
*LEAD*
*ATTORNEY*
*ATTORNEY*
*TO BE*

NOTICED

V.

**Defendant**

**Distinct Corporation**                     represented by **Jennifer Lee Taylor**
Morrison & Foerster LLP
425 Market St.
San Francisco, CA 94105-2482
(415) 268-7000
Email: JLeeTaylor@mofo.com
*LEAD*
*ATTORNEY*
*ATTORNEY*
*TO BE*
*NOTICED*

**John A.D. Kelley**
Russo & Hale, LLP
401 Florence Street
Palo Alto, CA 94301
650-327-9800
Email: jkelley@computerlaw.com
*LEAD*
*ATTORNEY*
*ATTORNEY*
*TO BE*
*NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2002 | 1 | COMPLAINT /*issued summons* against Distinct Corporation (Filing fee $150 receipt number 4405471). Filed by Netbula, LLC. (ga, ) (Entered: 03/15/2002) |
| 03/13/2002 | | Summons Issued as to Distinct Corporation (ga, ) (Entered: 03/15/2002) |

| 03/13/2002 | 2 | ADR SCHEDULING ORDER: Case Management Statement due by 7/10/2002. Case Management Conference set for 7/17/2002 at 10:30 AM.. Signed by Judge James Larson on 3/13/02. (ga, ) (Entered: 03/15/2002) |
|---|---|---|
| 03/15/2002 | | REPORT on the filing or determination of an action regarding *trademark* (cc: form mailed to register). (ga, ) (Entered: 03/15/2002) |
| 03/29/2002 | 3 | SUMMONS Returned Executed, by Netbula, LLC. Distinct Corporation (ga, ) (Entered: 04/02/2002) |
| 04/15/2002 | 4 | STIPULATION *extending time to answer by 4/29/02* by Distinct Corporation, Netbula, LLC. (ga, ) (Entered: 04/17/2002) |
| 04/29/2002 | 5 | ANSWER to Complaint by Distinct Corporation. (ga, ) (Entered: 05/01/2002) |
| 06/27/2002 | 6 | ADR Certification re handbook and ADR options (ADR L.R. 3-5b) (ga, ) (Entered: 07/03/2002) |
| 06/28/2002 | 7 | Clerk's Notice of Case Management Conference set for 7/24/2002 at 09:30 AM. (ga, ) (Entered: 07/03/2002) |
| 07/01/2002 | 8 | CORRECTED Clerk's Notice of Case Management Conference set for 7/24/2002 at 10:30 AM. (ga, ) (Entered: 07/03/2002) |
| 07/02/2002 | | Remark : ADR phone conference set for 7/11/02 at 10:30am (bt, ) (Entered: 07/02/2002) |
| 07/10/2002 | 9 | JOINT CASE MANAGEMENT STATEMENT filed by Distinct Corporation, Netbula, LLC. (ga, ) (Entered: 07/12/2002) |
| 07/11/2002 | | ADR Phone Conference by HAH (tjs, ) (Entered: 07/12/2002) |
| 07/24/2002 | 10 | Consent to Proceed Before a U.S. Magistrate Judge by Distinct Corporation, Netbula, LLC. (ga, ) (Entered: 07/25/2002) |
| 07/24/2002 | 11 | Minute Entry: Initial Case Management Conference held on 7/24/2002 before James Larson, Case referred to early neutral evaluation.. Counsel may conduct discovery deemed necessary, i.e. limited to exchange of documents, and to submit letter update after ENE (Tape #02-29.) (ga, ) (Entered: 07/25/2002) |

| 09/05/2002 | 12 | ADR CLERK'S NOTICE dated 9/5/02 appointing Evaluator, Claude M. Stern. (cmf, ) (Entered: 09/05/2002) |
|---|---|---|
| 09/13/2002 | 13 | Letter *dated 9/12/02 re: appointment and scheduling the pre-session phone conference* from Evaluator Claude Stern. (cmf, ) (Entered: 09/13/2002) |
| 10/03/2002 | 14 | Letter *dated 10/2/02 scheduling pre-session telephone conference for 10/4/02 at 2:00 p.m.* from Evaluator, Claude M. Stern. (cmf, ) (Entered: 10/03/2002) |
| 10/30/2002 | 15 | MOTION for Leave to File *Supplemental Counterclaims* filed by Distinct Corporation. Motion Hearing set for 12/4/2002 09:30 AM. (ga, ) (Entered: 10/31/2002) |
| 10/30/2002 | 16 | DECLARATION in Support re 15 filed by Distinct Corporation. (Related document(s) 15 ) (ga, ) (Entered: 10/31/2002) |
| 11/12/2002 | 17 | ORDER Continuing Motion Hearing Motion Hearing set for 1/8/2003 09:30 AM. (ga, ) (Entered: 11/15/2002) |
| 11/13/2002 | 18 | Memorandum in Opposition re 15 filed by Netbula, LLC. (ga, ) (Entered: 11/15/2002) |
| 11/13/2002 | 19 | DECLARATION in Support re 18 *OF Neil A. Smith* filed by Netbula, LLC. (Related document(s) 18 ) (ga, ) (Entered: 11/15/2002) |
| 11/13/2002 | 20 | CERTIFICATE OF SERVICE by Netbula, LLC re 18 (ga, ) (Entered: 11/15/2002) |
| 11/20/2002 |  | Set/Reset Hearings: ENE Hearing set for 11/22/2002 09:30 AM. (cmf, ) (Entered: 11/20/2002) |
| 11/20/2002 | 22 | Response re 18 by Distinct Corporation. (ga, ) (Entered: 11/26/2002) |

| Date | No. | Description |
|------|-----|-------------|
| 11/25/2002 | 21 | CERTIFICATION OF ENE *dated 11/22/02 by Evaluator, Claude M. Stern; ENE session held 11/22/02; Case did not settle; ADR process is complete.* (cmf, ) (Entered: 11/25/2002) |
| 12/19/2002 | 23 | Memorandum in Opposition re 15 filed by Netbula, LLC. (ga, ) (Entered: 12/27/2002) |
| 01/08/2003 | 24 | Minute Entry: Initial Case Management Conference held on 1/8/2003 before James Larson. Status Conference set for 2/19/2003 10:30 AM. Defendants motion to file supplemental counterclaim is GRANTED;(Court Reporter Juanita Gonzalez.) (ga, ) (Entered: 01/13/2003) |
| 01/17/2003 | <u>25</u> | ORDER Granting Leave to Amend . Signed by Judge James Larson on 1/17/03. (ga, ) Additional attachment(s) added on 3/21/2005 (Mancuso, JoAnn). (Entered: 01/23/2003) |
| 01/22/2003 | 26 | ANSWER TO COUNTERCLAIM by Netbula, LLC. (ga, ) (Entered: 01/23/2003) |
| 02/19/2003 | 27 | Minute Entry: Further Case Management Conference held on 2/19/2003 before James Larson. Case referred to Magistrate Spero for settlement conference (Tape #03-2.) (ga, ) (Entered: 02/24/2003) |
| 03/03/2003 | 28 | ORDER Settlement Conference set for 5/19/2003 09:30 AM.. Signed by Judge Joseph C. Spero on 3/3/03. (ga, ) (Entered: 03/06/2003) |
| 05/19/2003 | 29 | Minute Entry: Settlement Conference held on 5/19/2003 before Joseph C. Spero. Case Settled; Settlement placed on the record. (Court Reporter 5/19/03.) (ga, ) (Entered: 05/20/2003) |
| 06/02/2003 | 30 | ORDER DISMISSING CASE with prejudice. Signed by Judge James Larson on 6/2/03. (ga, ) (Entered: 06/06/2003) |

# EXHIBIT B

1  JENNIFER LEE TAYLOR (BAR NO. 161368)
   KIMBERLY A. ECKHART (BAR NO. 189377)
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California 94105-2482
   Telephone: (415) 268-7000
4  Facsimile: (415) 268-7522

5  Attorneys for Defendant
   DISTINCT CORPORATION

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12  NETBULA, LLC., a California limited liability        No.      C 02-1253 JL
    company,
13
                           Plaintiff,                   **DEFENDANT DISTINCT
14                                                      CORPORATION'S SUPPLEMENTAL
         v.                                             COUNTERCLAIMS FOR
15                                                      TRADEMARK INFRINGEMENT,
    DISTINCT CORPORATION, a California                  UNFAIR COMPETITION, FALSE
16  corporation,                                        DESIGNATION OF ORIGIN; STATE
                                                        LAW UNFAIR BUSINESS
17                         Defendant.                   PRACTICES, DECEPTIVE, FALSE,
                                                        AND MISLEADING ADVERTISING,
18                                                      COMMON LAW TRADEMARK
                                                        INFRINGEMENT, INTENTIONAL
19                                                      INTERFERENCE WITH
                                                        PROSPECTIVE ECONOMIC
20                                                      ADVANTAGE, LIBEL; INJUNCTIVE
                                                        RELIEF**
21
                                                        **DEMAND FOR JURY TRIAL**
22

23

24          Defendant DISTINCT CORPORATION ("Distinct" or "Defendant"), as its counterclaims

25  against Plaintiff NETBULA, LLC ("Netbula" or "Plaintiff"), alleges as follows:

26

27

28

## General Background

1.     Distinct provides computer software for developing network and Internet applications and offers for licensing a program called Distinct RPC based on Sun's Open Network Computing RPC standards.

2.     Distinct is the owner of the incontestable federal trademark registration for DISTINCT® for "computer software for personal computers and work stations in the field of general business," Registration No. 1,629,906. Distinct has used the DISTINCT® trademark and trade name in connection with this product since at least as early as March 15, 1989. This registration is valid, subsisting, uncancelled, unrevoked, and incontestable. Distinct is the owner of the trademark covered thereby and of the goodwill and reputation of the business connected with and symbolized by this registered trademark.

3.     Netbula is in the business of providing computer software for developing network and Internet applications and services related thereto, including RPC computer software development tools based on Sun's Open Network Computing RPC standards.

4.     Netbula and Distinct are direct competitors.

## Background for Counterclaims

5.     Prior to filing the complaint, Netbula posted a cease and desist letter to Distinct on Netbula's website. Netbula did not mail the letter to Distinct or to any agent of Distinct. Nor did Netbula contact Distinct or any agent of Distinct about the cease and desist letter or otherwise demand that Distinct cease the conduct of which it complains in its complaint. As a result, Distinct first learned that Netbula was concerned about its conduct when it was served with the complaint in this matter on March 25, 2002.

6.     The complaint alleges: (1) Distinct modified several of its Internet web pages on its website by copying and using in the metatags of its web pages Netbula's "Netbula" and "PowerRPC" marks; and (2) Distinct purchased from the Internet search engine company Google the exclusive

2

1  rights to display Distinct's advertisement for its products when an Internet user searched for one or

2  more of Netbula's trademarks or trade names as "key words."

3      7.   As to the first alleged wrongful act, Distinct discontinued use of the metatags the day

4  after it learned that the instant lawsuit had been filed.

5      8.   As to the second alleged wrongful act, Distinct ceased use of "Netbula" and

6  "PowerRPC" as key words for advertisements with Google in November 2001, months prior to the

7  filing of this lawsuit and without receiving any request or notice from Netbula. Distinct has not used

8  as key words any other terms that Netbula claims are trademarks.

9      9.   In spite of Distinct having ceased all allegedly wrongful conduct by March 27, 2002,

10  Netbula took actions thereafter intended to disparage Distinct's business reputation and hurt

11  Distinct's business.

12      10.  On information and belief, shortly after Nebula filed the instant lawsuit, it posted

13  information on its website concerning the lawsuit ("information posting"). Attached hereto as

14  Exhibit A is a copy of the information posting as it appeared on April 8, 2002.

15      11.  On information and belief, at some point in time, Netbula revised its information

16  posting in a fashion that caused it to be misleading and to wrongfully disparage Distinct's business.

17  **Netbula's Misleading Posting**

18      12.  The information posting on Netbula's website on October 24, 2002 describing the

19  dispute between the parties includes the following quote:

20          In October 1999, Netbula sent a letter to Distinct via its legal counsel
           regarding Netbula's JavaRPC and Distinct's RPC for Java product, the
21          letter concluded by saying "we (Netbula) will not tolerate any unlawful
           activity that was designed to destroy our hard work, our intellectual
22          property and our reputation."

23  Attached hereto as Exhibit B is a copy of the information posting as it appeared on Netbula's website

24  on October 24, 2002.

25      13.  Netbula does not explain that it sent the October 1999 letter two years earlier *in*

26  *response to a demand letter* that Distinct sent to Netbula regarding Netbula's infringing activity. The

27  letter was Netbula's attempt to defend itself when accused of copyright infringement and has no

28                                                          3

1  relationship with the current dispute whatsoever. By referencing the October 1999 letter at the

2  beginning of the discussion of the current lawsuit, Netbula wrongfully misleads the public into

3  believing that Netbula complained about Distinct's allegedly infringing activities in 1999, and that

4  Distinct ignored Netbula's complaint for over two years. Moreover, Netbula's inclusion of the

5  information in the October 1999 letter in its posting about the current lawsuit will cause the public to

6  conclude that Netbula directly contacted Distinct prior to filing the lawsuit regarding the trademark

7  issues, which is not true.

8      14.   Netbula's information posting amounts to unfair competition because it is deceptive and

9  misleading.

10  **Netbula's Other Wrongful Conduct**

11     15.   During the pendency of the lawsuit, Netbula has also engaged in other wrongful

12  conduct and trademark infringement.

13     16.   On information and belief, Netbula is wrongfully using the DISTINCT® trade name

14  and federally registered trademark in association with the word "RPC" in the title bar of its browser,

15  in the title and body of the posting about the lawsuit, and in the body of its home page.

16     17.   Defendant believes that Plaintiff made each of the changes with respect to its use of the

17  DISTINCT® trade name and mark in connection with the word "RPC" so that when a consumer uses

18  an Internet search engine (such as Google or Yahoo) and enters "Distinct Corporation" or "Distinct

19  RPC," links to Netbula's posting about the lawsuit and Netbula's home page appear on the very first

20  page of search returns.

21     18.   As a result, a consumer who searches for information on Distinct or its products and

22  retrieves Netbula's misleading and disparaging posting about this lawsuit and Distinct's conduct may

23  be deterred from purchasing products from Distinct and seek out the products of its competitors (*i.e.*,

24  Netbula).

25     19.   Netbula's wrongful conduct effectively diverts Internet users who are looking for

26  Distinct's website to Netbula's website, on which Netbula offers competing products and has posted

27  misleading statements about Distinct.

28

4

20. As such, Netbula is wrongfully using Distinct's federally registered DISTINCT® trade name and trademark, as well as a misleading information posting, to divert business from Distinct.

**Irreparable Harm to Distinct**

21. Netbula's wrongful conduct promotes Netbula's business and interferes with Distinct's business.

22. On information and belief, Netbula knew that the DISTINCT® mark is registered with the United States Patent Trademark Office and owned by Distinct. By adopting and using the DISTINCT® mark, Netbula intended to and did induce, and intends to and will induce, customers to purchase its products by trading off the extensive goodwill built up by Distinct.

23. Netbula's action have been and are willful, deliberate and in complete disregard of Distinct's rights and interests.

24. Netbula's actions have injured Distinct's business reputation.

25. Netbula's unauthorized use of Distinct's trade name and DISTINCT® trademark will result in lost sales opportunities for Distinct.

26. The various practices described herein threaten irreparable injury to Distinct's business and reputation.

27. Netbula's conduct is continuing and will continue unless restrained by the Court. Unless Netbula is enjoined from engaging in the wrongful conduct described above, Distinct will suffer irreparable injury and further harm. Distinct has no adequate remedy at law. In the alternative, Distinct has been damaged in an amount to be determined by the Court.

## FIRST COUNTERCLAIM

### (Trademark Infringement – Federal Law)

28. Netbula incorporates by reference paragraphs 1 through 27 above as though fully set forth herein.

29. The above acts by Netbula constitute trademark infringement of the mark identified by Registration No. 1,629,906, in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114.

30. Netbula's wrongful acts have permitted or will permit it to make substantial sales and profits on the strength of Distinct's substantial worldwide advertising, sales, consumer recognition, and goodwill.

31. As a direct and proximate result of Netbula's wrongful conduct, Distinct has been and will be deprived of, among other things, the value of its federally registered trade mark as a commercial asset.

32. Netbula's unauthorized use of the DISTINCT® trade name and mark is likely to cause confusion of consumers as to the origin of Netbula's products and services.

33. Netbula has been on notice that the DISTINCT® mark is registered with the United States Patent and Trademark Office. Distinct has requested Netbula cease and desist from its acts of infringement and has given Netbula notice of Distinct's federal registration, but Netbula has not ceased such acts.

34. Netbula's actions have been and are willful, deliberate, and in complete disregard of Distinct's rights and interests.

35. Distinct has no adequate remedy at law for Netbula's continued violation of Distinct's rights.

36. As a direct and proximate result of Netbula's wrongful conduct, Distinct has been damaged by Netbula's wrongful acts, and such damage will continue unless the Court enjoins Netbula's acts.

**SECOND COUNTERCLAIM**

**(Unfair Competition and False Designation of Origin – Federal Law)**

37. Distinct incorporates by reference paragraphs 1 through 36 above as though fully set forth herein.

38. The above acts by Netbula constitute unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

DEFENDANT DISTINCT CORPORATION'S
SUPPLEMENTAL COUNTERCLAIMS
CASE NO. C02-1253 JL
sf-1393289

39.     As alleged above, Distinct has used its DISTINCT® trade name and mark to distinguish its products from those offered by others.  Those products are distributed in the channels of trade in which Netbula does business.

40.     Netbula's unauthorized use of the DISTINCT® trade name and mark is likely to cause confusion of consumers as to the origin of Netbula's products and services.

41.     In addition, Netbula's use of the DISTINCT® trade name and mark under the circumstances constitutes a false designation of origin for products and services.

42.     As a direct and proximate result of Netbula's wrongful conduct, Distinct has been damaged by Netbula's wrongful acts, and such damage will continue unless the Court enjoins Netbula's acts.

## THIRD COUNTERCLAIM

### (Unfair Business Practices – California Law)

43.     Distinct incorporates by reference paragraphs 1 through 42 above as though fully set forth herein.

44.     The above acts by Netbula are likely to mislead the general public and therefore constitute unfair and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising in violation of California Business & Professions Code §§ 17200, *et seq.*

45.     The unfair and fraudulent business practices and deceptive and untrue advertising of Netbula present a continuing threat to members of the public in that Netbula intends to promote and advertise its sale of directly competing products by wrongfully trading on the name and goodwill of the DISTINCT® trade name and mark.

46.     As a direct and proximate result of these acts, Netbula will receive substantial sales and profits generated from the strength of Distinct's success, goodwill, and consumer recognition.

47.     As a direct and proximate result of Netbula's wrongful conduct, Distinct has been injured by Netbula's wrongful acts, and such harm will continue unless the Court enjoins Netbula's acts.  Distinct has no adequate remedy at law for Netbula's continuing violation of Distinct's rights.

DEFENDANT DISTINCT CORPORATION'S
SUPPLEMENTAL COUNTERCLAIMS
CASE NO. C02-1253 JL
sf-1393289

# FOURTH COUNTERCLAIM

## (Deceptive, False, and Misleading Advertising – California Law)

48.  Distinct incorporates by reference paragraphs 1 through 47 above as though fully set forth herein.

49.  The above acts by Netbula constitute untrue and misleading advertising as defined by California Business & Professions Code § 17500, *et seq.*

50.  The acts of untrue and misleading advertising by Netbula described above present a continuing threat to members of the public.

51.  Netbula's false and misleading advertising will permit it to make substantial sales and profits on the strength of Distinct's success, goodwill, and consumer recognition.

52.  As a direct and proximate result of Netbula's wrongful conduct, Distinct has been damaged by Netbula's wrongful acts, and such damage will continue unless the Court enjoins Netbula's wrongful acts.

# FIFTH COUNTERCLAIM

## (Trademark Infringement – Common Law)

53.  Distinct incorporates by reference paragraphs 1 through 52 above as though fully set forth herein.

54.  In addition to the rights under the Lanham Act and state statutory law, set forth above, Distinct also has valid and existing common law rights with respect to its DISTINCT® mark.

55.  The above acts by Netbula constitute trademark infringement of Distinct's DISTINCT® mark in violation of Distinct's common law rights.

56.  As a direct and proximate result of Netbula's wrongful conduct, Distinct has been damaged by Netbula's wrongful acts, and such damage will continue unless the Court enjoins Netbula's acts.

# SIXTH COUNTERCLAIM

## (Intentional Interference with Prospective Economic Advantage – Common Law)

57. Distinct incorporates by reference paragraphs 1 through 56 above as though fully set forth herein.

58. Distinct has valid existing and/or prospective economic interest in its relationships with its actual and prospective customers and its reputation within the software development community.

59. Upon information and belief, Netbula knew of these existing and/or prospective economic relationships and of the resulting actual or potential benefits to Distinct, including actual or potential increases in Distinct's income.

60. The above acts by Netbula interfere with Distinct's prospective economic relationships.

61. Distinct has been and will continue to be damaged by Netbula's wrongful conduct to interfere with Distinct's economic advantage.

62. As a direct and proximate result of Netbula's wrongful conduct, Distinct has been damaged by Netbula's wrongful acts, and such damage will continue unless the Court enjoins Netbula's wrongful acts.

# SEVENTH COUNTERCLAIM

## (Libel – Common Law)

63. Distinct incorporates by reference paragraphs 1 through 62 above as though fully set forth herein.

64. Netbula's posting of the press release concerning the lawsuit constitutes libel because it contains defamatory information that is false and misleading.

65. Distinct's business reputation has been and will continue to be damaged by Netbula's libelous conduct.

66. In addition, Distinct's ability to draw new customers has been and will continue to be damaged by Netbula's libelous conduct.

1    67.    As a direct and proximate result of Netbula's wrongful conduct, Distinct has been

2    damaged by Netbula's wrongful acts, and such damage will continue unless the Court enjoins

3    Netbula's acts.

4                                **PRAYER FOR RELIEF**

5         WHEREFORE, Distinct prays for the following relief:

6         1.    That the Court preliminarily enjoin Netbula, its officers, agents, servants, employees,

7    attorneys, Internet service providers, and all others in active concert or participation with them from

8    using the DISTINCT® trade name or mark in the sale, offering for sale, distribution, advertising, or

9    promoting of computer software on its Internet website, whether part of the directory, computer code,

10   metatags, or any other web page, or in connection with the retrieval of data or information by Internet

11   search engines; from passing Netbula's products off as being associated with Distinct; from

12   maintaining on its Internet web site a posting about the currently pending lawsuit to the extent it

13   contains reference to the unrelated dispute between the parties; from posting any other misleading

14   statements regarding Distinct or the parties' earlier, unrelated dispute; from using in any manner in

15   visible or hidden code or text web pages, metatags, or as key words on the Internet or otherwise the

16   DISTINCT® trade name and mark; and from committing any other unfair business practices directed

17   toward obtaining for themselves the business and customers of Distinct.

18        2.    That following trial of this action, the Court enter final judgment as follows:

19             (a)    That the Court issue a permanent injunction enjoining Netbula, its officers, agents,

20   servants, employees, attorneys, Internet service providers, and all others in active concert or

21   participation with them from using the DISTINCT® trade name or mark in the sale, offering for sale,

22   distribution, advertising, or promoting of computer software on its Internet website, whether part of

23   the directory, computer code, metatags, or any other web page, or in connection with the retrieval of

24   data or information by Internet search engines; from passing Netbula's products off as being

25   associated with Distinct; from maintaining on its Internet web site a posting about the currently

26   pending lawsuit to the extent it contains reference to the unrelated dispute between the parties; from

27   posting any other misleading statements regarding Distinct or the parties' earlier, unrelated dispute;

28

                                            10

1   from using in any manner in visible or hidden code or text web pages, metatags, or as key words on

2   the Internet or otherwise the DISTINCT® trade name and mark; and from committing any other

3   unfair business practices directed toward obtaining for themselves the business and customers of

4   Distinct.

5              (b)    That the Court award Distinct the profits made by Netbula and the actual damages

6   suffered by Distinct as a result of Netbula's unlawful conduct, in an amount to be proven at trial.

7              (c)    That the Court treble damages and enhanced profits pursuant to 15 U.S.C.

8   § 1117(b).

9              (d)    That the Court award Distinct its costs and attorneys' fees pursuant to 15 U.S.C.

10  § 1117.

11             (e)    That the Court grant Distinct any other remedy to which it may be entitled,

12  including all remedies provided for in 15 U.S.C. § 1117 and under California law.

13             (f)    That the Court award such other relief as it deems just and proper.

14

    Dated: October 30, 2002
15

16
                                        JENNIFER LEE TAYLOR
17                                      KIMBERLY A. ECKHART
                                        MORRISON & FOERSTER LLP
18

19
                                        By: _____
20                                           Jennifer Lee Taylor

21                                      Attorneys for Defendant
                                        DISTINCT CORPORATION
22

23

24

25

26

27

28
    DEFENDANT DISTINCT CORPORATION'S                        11
    SUPPLEMENTAL COUNTERCLAIMS
    CASE NO. C02-1253 JL
    sf-1393289

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 3-6, Defendant Distinct Corporation demands a trial by jury.

Dated: October 30, 2002

JENNIFER LEE TAYLOR
KIMBERLY A. ECKHART
MORRISON & FOERSTER LLP


By: _Jennifer Lee Taylor_
 Jennifer Lee Taylor

Attorneys for Defendant
DISTINCT CORPORATION

DEFENDANT DISTINCT CORPORATION'S
SUPPLEMENTAL COUNTERCLAIMS
CASE NO. C02-1253 JL
sf-1393289

EXHIBIT A

# RPC Vendor NETBULA Filed Suit Against Distinct Corporation For Trademark Infringement On The Internet

## Who is Netbula?

**Since 1996, Netbula LLC has been a global leader in RPC development tools. RPC standards for Remote Procedure Call, and is a technology that helps the development of client/server applications. Netbula's RPC product line include <u>PowerRPC for UNIX and Windows</u>, <u>ONC RPC for Win32</u> (95/98/ME/2000/XP) and <u>JavaRPC</u> (ONC RPC for Java).**

## What is the lawsuit about?

In its complaint, Netbula alleges that Distinct has engaged in extensive infringement and unfair conduct. Distinct's acts include 1) embedding the NETBULA and PowerRPC trademarks and trade name into Distinct's web page's hidden HTML keyword meta tags (<u>screen capture</u>) 2) purchasing Netbula's trademark and trade name as key word advertisement from at least one Internet search engine. By these acts, Distinct is able to get Internet search engines to display Distinct's web links and advertisement when potential customers are in fact looking for information about Netbula and Netbula's products. Netbula contends that Distinct's acts constitute trademark and trade name infringement and violated other federal and state laws. . <u>Read the full press release</u> (<u>HTML online</u>)

<u>The filed complaint</u> (2MB PDF)

Netbula's suit is seeking an injunction against Distinct, it also seeks treble damages and punitive damages.

## What are meta tags?

Meta tags are invisible HTML code that can be used to define key words for a web page. Search engines use the meta tags to index web pages.

## What are key word ads?

Search engines (such as www.google.com) offer paid services to display ads when a user enter search words. In this case, Distinct purchased "Netbula" and "PowerRPC" as key word ads, so whenever a user enters these trademarks into the search engine's search box, Distinct's ads will show up at prominent positions of the search result pages.

## We request that you report any unfair competition behavior against Netbula

It's our belief a competitor may be resorting to other unfair acts to harm Netbula's business, if you know of any such acts, please report to Netbula by e-mail to legal@netbula.com, or fax to 1-510-291-2237 ATTN: Legal Dept.

## References to similar cases

- Playboy vs. AsiaFocus
- Playboy vs. Calvin Design Labels
  "Defendants' Meta Tag ... is a counterfeit.."

---

Netbula LLC (C) 2002, All rights reserved

**EXHIBIT B**

# RPC Vendor NETBULA Filed Suit Against Distinct Corporation For Trademark Infringement On The Internet

### Who is Netbula?

Since 1996, Netbula LLC has been a global leader in RPC development tools. RPC standards for Remote Procedure Call, and is a technology that helps the development of client/server applications. Netbula's RPC product line include PowerRPC for UNIX and Windows, ONC RPC for Win32 (95/98/ME/2000/XP) and JavaRPC (ONC RPC for Java). Companies such as AOL, Booze Allan & Hamilton, Citicorp, FedEx, HP, Intel, Merril Lynch, Nokia, Nortel, NTT, Samsung, Sony, Siemens, Tektronics and others chose Netbula RPC for the quality and performance it delivers.

### What is the lawsuit about?

In its complaint, Netbula alleges that Distinct has engaged in extensive infringement and unfair conduct. Distinct's acts include 1) embedding the NETBULA and PowerRPC trademarks and trade name into Distinct's web page's hidden HTML keyword meta tags (screen capture) 2) purchasing Netbula's trademark and trade name as key word advertisement from at least one Internet search engine.

This screen capture shows the Google search results for Netbula/PowerRPC tradmarks. After having discovered that Distinct has purchased the Netbula/PowerRPC as keyword ads, Netbula posted an open letter requesting Distinct to stop such unethical acts, without a result, Netbula purchased key word ads for "Netbula". The screen thus shows both Netbula's link and Distinct's link

"Power your RPC" (note, Netbula's mark is PowerRPC).

By these acts, Distinct is able to get Internet search engines to display Distinct's web links and advertisement when potential customers are in fact looking for information about Netbula and Netbula's products. Netbula contends that Distinct's acts constitute trademark and trade name infringement and violated other federal and state laws. . Read the full press release (HTML online)

The filed complaint (2MB PDF)

In October 1999, Netbula sent a letter to Distinct via its legal counsel regarding Netbula's JavaRPC and Distinct's RPC for Java product, the letter concluded by saying " we (Netbula) will not tolerate any unlawful activity that was designed to destroy our hard work, our intellectual property and our reputation."

Netbula's suit is seeking an injunction against Distinct, it also seeks treble damages and punitive damages.

## What are meta tags?

Meta tags are invisible HTML code that can be used to define key words for a web page. Search engines use the meta tags to index web pages.

## What are key word ads?

Search engines (such as www.google.com) offer paid services to display ads when a user enter search words. In this case, Distinct purchased "Netbula" and "PowerRPC" as key word ads, so whenever a user enters these trademarks into the search engine's search box, Distinct's ads will show up at prominent positions of the search result pages.

## We request that you report any unfair competition behavior against Netbula

It's our belief a competitor may be resorting to other unfair acts to harm Netbula's business, if you know of any such acts, please report to Netbula by

e-mail to legal@netbula.com, or fax to 1-510-291-2237 ATTN: Legal Dept. A minimum of $1000 will be awarded to anyone who provides evidence which leads to the prosecution of violators.

## References to similar cases

- Playboy vs. AsiaFocus
  "award of the maximum statutory amount of $1,000,000" for each mark infringed
- Playboy vs. Calvin Design Labels
  "Defendants' Meta Tag ... is a counterfeit.."

---

Netbula LLC (C) 2002, All rights reserved

# EXHIBIT C

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10

11   NETBULA, LLC,                              No. C 02-1253    JL

12              Plaintiffs,                      **ORDER GRANTING**
                                                 **LEAVE TO AMEND**
13        v.                                     **document # 15**

14   DISTINCT CORPORATION.,

15              Defendants.

16   _____/

17

18        Defendant's Motion for Leave to Amend its Counterclaim (Document # 15 in the court's

19   docket) came on for hearing on January 8, 2003, Neil A. Smith, Howard, Rice, Nemerovski,

20   Canady, Falk & Rabkin, appeared for plaintiff Netbula, LLC ("Netbula").

     Kimberly A. Eckhart, Morrison & Foerster, appeared for defendant Distinct Corporation
21
     ("Distinct"). The court considered the moving and opposing papers and the arguments of
22
     counsel and granted the motion from the bench. The court herein presents the reasoning
23
     behind its ruling.
24
          Distinct's counterclaims are not futile and Netbula will not be prejudiced by permitting
25
     Distinct to amend its counterclaims to add the following:
26
          1) that Netbula has posted false and misleading information on its website and
27

28

1  2) that Netbula has engaged in unfair competition by creating initial interest confusion

2  through excessive use of the Distinct trademark and trade name on the Netbula website.

3

4  BACKGROUND

5  The parties, both California corporations, are competitors in creating and marketing

6  RPC development tools. RPC stands for "Remote Procedure Call," a technology which helps

7  the development of client/server applications. Netbula's product is called PowerRPC.

8  Netbula sued Distinct for trademark infringement, unfair competition and intentional

9  interference with prospective economic advantage. Netbula alleges that Distinct has engaged

10  in extensive infringement and unfair practices, including:

11  1) embedding the NETBULA and PowerRPC trademarks and trade name into

12  Distinct's web pages hidden HTML keyword meta tags, and [1]

13  2) purchasing Netbula's trademark and trade name as key word advertisement from at

14  least one Internet search engine (Google).

15  This court has original jurisdiction under federal copyright law and the Lanham Act. The

16  parties consented to this court's jurisdiction as required by 28 U.S.C. section 636(c). At the

17  initial Case Management Conference, this court recommended to the parties that they refrain

18  from any but limited written discovery, to minimize legal fees, in the hope that ENE would

19  result in a settlement. Netbula claims Distinct violated that understanding by filing its motion for

20  leave to amend, and not granting Netbula an extension of time to respond, until after the Early

21  Neutral Evaluation ("ENE") session. ENE did not settle the case:

22  Distinct seeks to add counterclaims: 1) that Netbula has posted false and misleading

23  information on its website and 2) that Netbula has engaged in unfair competition by creating

24  initial interest confusion through excessive use of the Distinct trademark and trade name on

25

26  _____

27  [1] HyperText Markup Language ("HTML")

28

1   the Netbula website.  Distinct's counterclaims seek to stop Netbula from posting on its web

2   site false and misleading information about this lawsuit as well as configuring its website using

3   the Distinct trademark and name in association with the acronym RPC, to lead to Netbula's

4   website being displayed when a prospective customer is actually searching for Distinct and its

5   products.

6

7                                NETBULA'S POSITION

8        Netbula sued Distinct after it claims to have caught Distinct "red-handed" using

9   Netbula's trademark and trade name, "Netbula" as a search term, and in Distinct's hidden

10  code and metatags. Netbula cites these as violations of the law, trademark infringement and

11  unfair competition. Netbula says that the sole basis for Distinct's counterclaims is a press

12  release by Netbula and story about this lawsuit, which of course results in some search

13  engines' bringing up references to the story when web surfers seek information about Distinct.

14  2

15       Netbula claims that its own action in posting the information about the lawsuit is entirely

16  different from what Distinct allegedly did. Netbula claims that it did not use Distinct's

17  trademark or trade name as hidden codes or metatags as Distinct did with Netbula's. Netbula

18  merely relies on the search engines to "do their job" and refer to visible content about Distinct,

19

20  _____

21       [2] The Ninth Circuit has found such use of metatags actionable as infringement:    Entertainment-industry
     information provider brought action against video rental store chain, asserting trademark infringement and unfair
22   competition based on chain's use of provider's "MovieBuff" trademark in domain name of chain's web site and web
     site's metatags. The United States District Court for the Central District of California, Carlos R. Moreno, J., denied
23   provider's motion for preliminary injunction, and provider appealed. The Court of Appeals, O'Scannlain, Circuit Judge,
     held that: (1) chain could not "tack" its use of term "moviebuff.com" onto its earlier use of trademark "The Movie
24   Buff's Movie Store"; (2) provider was senior user of "MovieBuff" mark; (3) provider established likelihood of success
     on its claim that chain's use of "MovieBuff" in its domain name would create likelihood of confusion; and (4) use of
25   confusingly similar mark in web site metatags is actionable under Lanham Act.
     Reversed and remanded. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036
26   C.A.9 (Cal.),1999

27

28

1  which happens to be about Netbula's lawsuit, rather than the "subterfuge and trickery"

2  employed by Distinct, to lure people to its own website when they are looking for Netbula.

3  Netbula also claims that its reporting about the lawsuit is privileged, and falls within the

4  litigation privilege. Netbula claims that California Civil Code section 47 expressly exempts the

5  allegations of lawsuits, threatened legal action and comments on them from tort liability, with

6  the exception of eventual claims for malicious prosecution. *See Silberg v. Anderson*, 50

7  Cal.3d 205, 212 (1990). Netbula cites an example in a lawsuit against Skippy, Inc., where the

8  Fourth Circuit upheld denial of an injunction against its adversary for telling her side of the

9  story on her web pages. *CPC Int'l. Inc. v Skippy Inc.*, 214 F.3d 456 (4th Cir. 2000). (*See also*

10  Skippy-scam.com).

11  Netbula  contends that the proposed counterclaims do not arise from "a common

12  nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them all in a

13  single judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

14  Netbula  invokes the First Amendment as protection for the article about this lawsuit.

15  Netbula claims that the website statement is a "non-actionable statement of opinion" under

16  both federal and state law. Consequently, any counterclaim by Distinct based on this

17  statement would be futile and the court should deny leave to amend to add it. Netbula relies on

18  the Ninth Circuit decision in the case of *Coastal Abstract Serv., Inc. v. First American Title*

19  *Ins. Co.*, 173 F.3d 725 (9th Cir. 1999). In that case the plaintiff, an escrow agent, sued a title

20  insurance company for tortious interference with contract and false advertising under the

21  Lanham Act based upon several alleged misrepresentations made by the title insurance

22  company about the escrow agent. One such alleged misrepresentation was a statement by

23  defendant that the plaintiff was acting illegally in providing its services because the escrow

24  agent was not licensed in California. *Id*. At 729-30. The parties disputed whether California

25  Financial Code section 17200 required the escrow agent to be licensed in California. The jury

26  found for plaintiff and awarded damages. The Ninth Circuit reversed. The court held: "[a]bsent

27  a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements

28  by laypersons that purport to interpret the meaning of a statute or regulation are opinion

United States District Court

For the Northern District of California

1  statements and not statements of fact." *Id.* At 731, *citing Dial A Car, Inc. v. Transportation*
2  *Inc.*, 82 F.3de 484, 489 (D.C. Cir. 1996).

3      Similarly, in the case at bar, Netbula claims that it is merely stating its opinion that
4  Distinct has violated the law, and this statement of opinion cannot be disproved by Distinct
5  until this court has reached its final verdict. Therefore, says Netbula, the mere fact that a
6  search for Distinct leads search engines to Netbula's article about its lawsuit against Distinct,
7  does not amount to a viable cause of action. Netbula claims that its opinions regarding the
8  outcome of future legal proceedings against Distinct cannot be a basis for liability under
9  California law. Thus, whatever Netbula predicts about its suit against Distinct cannot be used
10 by Distinct as the basis of a counterclaim. Therefore, this court should not grant leave for
11 Distinct to amend to add it as a counterclaim.

12     Netbula believes the same holds true for Distinct's claim for intentional interference with
13 prospective economic advantage - such a claim requires false statements of fact. *Computer*
14 *XPress, Inc. v. Jackson*, 93 Cal.App.4th 993, 1014 (2001).

15     Finally, Netbula believes that if the court permits Distinct to amend its counterclaims,
16 the scope of the litigation would be radically changed. New issues of First Amendment and
17 libel would be injected into the case, which would require extensive additional discovery into,
18 and factual and legal analyses of, the parties' respective beliefs, the public's perceptions, and
19 the parties' prior correspondence. For example, Netbula could contend that it had been
20 misquoted, or that search engines malfunctioned, or that any statements by Netbula were not
21 made in United States commerce.

22

23                                DISTINCT'S POSITION

24     Distinct directs this court's attention to a recent ruling by Judge Claudia Wilken in the
25 case of *J.K. Harris & Co., LLC v Kassel, et al.*, 2002 U.S.Dist LEXIS 7862 (March 22, 2002).
26 Judge Wilken granted an injunction. In that case, the plaintiff, an accounting firm which
27 specialized in negotiating with the IRS to work out payment terms for taxpayers, moved
28 pursuant to 15 U.S.C. section 1125 for an injunction against the defendant, a competitor who

1  allegedly published on its website unfavorable information about plaintiff. *Id*. Plaintiff also

2  alleged that defendant had constructed its website, "taxes.com," so that web surfers seeking

3  plaintiff's website would be diverted to defendant's website where they would read the

4  unfavorable account of plaintiff's dealings with defendant. *Id*. Plaintiff in that case alleged that

5  defendant employed a "strategic combination of computer programming techniques,"

6  including excessive use of plaintiff's trade name, the use of "header tags" and "underline tags"

7  around sentences containing plaintiff's trade name, and the use of larger fonts and strategic

8  placement of sentences containing plaintiff's trade name on defendant's website. *Id*. At *9-10.

9  Searchers looking for information about plaintiff would be led to defendant's website which

10  provided a link that stated "Complaints about JK Harris Pile Up." *Id*. At *10.

11       To determine whether defendant's use of plaintiffs' trademark and trade name is

12  nominative and does not constitute trademark infringement, Judge Wilken applied the three-

13  part test articulated by the Ninth Circuit in *New Kids on the Block v. News Am. Publ'g, Inc.* 971

14  F2d 302 (9th Cir. 1992):

15       where the defendant uses a trademark to describe the plaintiff's product, rather than its
      own, we hold that a commercial user is entitled to a nominative fair use defense
16       provided he meets the following three requirements: First, the product or service in
      question must be one not readily identifiable without use of the trademark; second, only
17       so much of the mark or marks may be used as is reasonably necessary to identify the
      product or service; and third, the user must do nothing that would, in conjunction with the
18       mark, suggest sponsorship or endorsement by the trademark holder.
   *Id*. At 308.

19       Judge Wilken granted the injunction despite concerns that the second prong might not

20  be satisfied, finding that "[s]ome of the computer programming techniques that Defendants

21  are alleged to be using may not satisfy this requirement." *JK Harris* at *16; *See also Playboy*

22  *Enters., Inc. (PEI) v. Welles*, 279 F.3d 796, 804 n. 30 (9th Cir. 2002) (finding that the

23  nominative use doctrine protected Welles' use of the PEI trademark, but that this finding was

24  fact specific and that the "decision might differ if the metatags listed the trademarked term so

25  repeatedly that Welles' site would regularly appear above PEI's in searches for one of the

26  trademarked terms.").

27       Judge Wilken in the *JK Harris* case concluded that "Plaintiff's evidence that

28

1  Defendants' website was designed in a manner to induce customer confusion is sufficient to
2  show a likelihood of success on its initial interest confusion claim." *JK Harris* at \*18. Judge
3  Wilken issued a preliminary injunction enjoining defendants from "using more of Plaintiff's
4  trade name than is reasonably necessary to identify that it is Plaintiff's services being
5  described, including using " J.K. Harris" or any permutation thereof as a keyword for the
6  taxes.com website more often than is necessary to identify the content of the website; using
7  'header Tags' and 'underline Tags' around sentences including Plaintiff's trade name on
8  Defendants' website (www.taxes.com), and increasing the prominence and font size of
9  sentences which include Plaintiff's trade name." *Id.* At \*30-31.

10  　　Distinct claims that in the case at bar, Netbula has employed techniques similar to
11  those used by the defendants in the *JK Harris* case. These include, but are not limited to: the
12  building of a substantial number of pages around a theme, insertion of keywords in the titlebar
13  of the browser, insertion of keywords in the title of the web page, the use of H1 tags to bold the
14  title with keywords, insertion of keywords in the first paragraph of the body text, and insertion
15  of keywords in the text of the link. Distinct also finds it significant that Netbula has placed a
16  reference to the lawsuit posting on each of its product pages and a link directly to the product
17  page from the posting.

18  　　Distinct objects to this, since one of its prospective customers who types in the words
19  Distinct and RPC receives a reference to a posting which contains what Distinct contends is
20  false and misleading information regarding this lawsuit, often accompanied by a reference to
21  Netbula's competing products. The posting regarding the lawsuit also provides links to lure the
22  prospective Distinct customer directly to Netbula's website describing its competing products.

23  　　Distinct rejects Netbula's claim that its postings are protected by the First Amendment;
24  the First Amendment does not protect false and misleading information. *See U-Haul Int'l., Inc.*
25  *v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986).   A party who is likely to be damaged in
26  its business by a false or misleading statement has a right to seek an order enjoining such
27  statements. *JK Harris* at \*21 (citations omitted). Judge Wilken ordered defendants to remove
28  third party statements which plaintiff claimed in verified declarations to be untrue. *Id.* at \*27.

　　Distinct also rejects Netbula's claim that its counterclaims would "radically change the

1    scope of the litigation," resulting in undue prejudice to Netbula. In fact, claims Distinct, its

2    proposed counterclaim is very similar, both legally and factually, to Netbula's complaint, and

3    would not involve adding new parties.

4        Distinct's counterclaims involve issues of the wrongful use of its trademark and trade

5    names in the meta field of a website to manipulate search engine results. Distinct brings

6    virtually the same causes of action as Netbula: trademark infringement, unfair competition,

7    trade name infringement, false advertising on the Internet and intentional interference with

8    prospective economic advantage under federal, state and common law. Because the

9    proposed new claims mirror claims in the lawsuit as originally filed by Netbula, Distinct asks

10   the court to grant leave to amend.

11

12                          ANALYSIS AND CONCLUSION

13       Under FRCP 15(a), leave to amend "shall be freely given when justice so requires." A

14   claim is considered futile and leave to amend to add it shall not be given if there is no set of

15   facts which can be proved under the amendment which would constitute a valid claim or

16   defense. *See Miller v Tykoff-Sexton*, 845 F.2d 209, 214 (9th Cir. 1988) Denial of leave to

17   amend on this ground is rare. Ordinarily, courts will defer consideration of challenges to the

18   merits of a proposed amended pleading until after leave to amend is granted and the

19   amended pleading is filed. *See Schwarzer, California Practice Guide: Federal Civil*

20   *Procedure Before Trial* at 8:422 (The Rutter Group, 2002).

21       Netbula focuses on the posting about the lawsuit, claiming privilege under Cal Civ.

22   Code section 47 and the First Amendment. Netbula asserts that opinions about legal

23   proceedings are opinions and not facts and therefore not grounds for tort liability. The problem

24   is that Distinct is also alleging that Netbula is using the same tricks Netbula alleges against

25   Distinct – using the trademarks and trade names of a competitor to lure prospective

26   customers to its own site and its own products.

27       At least one author of a recent law review article is of the opinion that all Internet use of

28   trademarks and trade names should be considered fair use, and not subject to claims of

     infringement:

1

2

3

4

5

Keyword banner advertising is a form of targeted online marketing practice whereby a banner ad is displayed on a search engine results page. The banner ad is triggered by the keyword used in the search. Many search engines sell trademarks as keywords as well, allowing competitors to purchase them as keywords for the purpose of displaying their own advertising. Some have argued that this practice should lead to liability for trademark infringement or dilution. Given the realities of online marketing and the underlying policies of trademark law, this is unlikely. Rather, this practice should be regarded as trademark fair use and treated as a form of lawful comparative advertising.

6

7

Saunders, Kurt M., *CONFUSION IS THE KEY: A TRADEMARK LAW ANALYSIS OF KEYWORD BANNER ADVERTISING,* 71 Fordham L. Rev. 543, *543 (November 2002)

8    Distinct's counterclaim for initial interest confusion mirrors the first claim in Netbula's

9   own complaint. Netbula's concerns about issues of the First Amendment, libel and so forth

10   would apply only in a limited way to its article about this lawsuit. Therefore, Netbula cannot

11   argue that permitting Distinct to add  counterclaims is futile or would change the scope of the

12   litigation to the prejudice of Netbula.

13    Distinct's motion for leave to amend to add the following counterclaims is granted:

14    1) that Netbula has posted false and misleading information on its website and

15    2) that Netbula has engaged in unfair competition by creating initial interest confusion

16   through excessive use of the Distinct trademark and trade name on the Netbula website.

17    IT IS SO ORDERED.

18   DATED: January 15, 2003

19

20

_____
James Larson
United States Magistrate Judge

21

22

23

24

25

26

27

28

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


NETBULA, LLC, a Delaware
limited liability company,

      Plaintiff,

vs.                                    No. C-06-0711-MJJ-WDB

BINDVIEW DEVELOPMENT CORPORATION,
a Texas corporation; SYMANTEC CORPORATION,
a Delaware corporation; ERIC J. PULASKI,
an individual; and DOES 1-10, inclusive,

      Defendants.

_____


30(b)(6) VIDEOTAPE DEPOSITION OF DONGXIAO YUE

VOLUME 1

San Francisco, California

Wednesday, June 27, 2007


Reported by:
KELLI COMBS
CSR No. 7705

Job No. 3-68374

10:39:16   1              THE WITNESS:  You mean the ONC RPC?

           2    BY MR. WAKEFIELD:

           3         Q    The port of the ONC RPC by Martin Gergeleit.

           4              Before, I thought I was asking about what you

10:39:26   5    knew in '95.  Now I'm saying at any time up until this

           6    lawsuit, are you aware of the Martin Gergeleit code?

           7              MS. BRILLET:  Objection.

           8              THE WITNESS:  I recall in the Distinct letter,

           9    they mentioned this name, Martin Gergeleit.

10:39:42  10    BY MR. WAKEFIELD:

          11         Q    Was that the first you had heard of it?

          12         A    Yeah.

          13         Q    So how long were you at that company called

          14    Medintell?

10:40:04  15         A    One year, less than one year.  Very -- very,

          16    very brief, because the company was later acquired by

          17    some other firm.

          18         Q    Do you know who acquired them?

          19         A    It's called ValueRx.

10:40:22  20         Q    Did you go on to work for ValueRx or did you

          21    leave?

          22         A    I left.

          23         Q    Okay.

          24              And where did you go after Medintell?

10:40:35  25         A    I came to California.

7d9734e9-5b37-4755-a751-18e5871db9b9

Page 111

13:47:51    1                      (Defendants' Exhibit 10 marked

            2                       for identification.)

            3     BY MR. WAKEFIELD:

            4        Q    Mr. Yue, Exhibit 10 also comes from Netbula's

13:48:05    5     document production in this case.

            6             Do you recognize this collection of documents?

            7        A    Yes.

            8        Q    Are these all Netbula web pages?

            9        A    Yes.

13:48:15   10        Q    Okay.

           11             Did you write these?

           12        A    The text on the page?

           13        Q    Yes.

           14        A    Yes.

13:48:25   15        Q    Okay.

           16             And these have a "DC" number at the bottom,

           17     DC102?

           18        A    Yes.

           19        Q    Do you know what that number refers to?

13:48:46   20        A    That's in a -- these pages were produced by a

           21     company called Distinct Corporation in a previous

           22     lawsuit.

           23        Q    Are these older versions of your website?

           24        A    Yes.

13:49:06   25        Q    When --

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

7d9734e9-5b37-4755-a751-18e5871db9b9

Page 112

13:49:07  1           Do you know when they -- when they were

2  active?

3       A    I don't know, but looking at the dates at the

4  bottom, it says 2002.

13:49:21  5       Q    Okay.

6           And then was that when your dispute with

7  Distinct took place, 2002?

8       A    I believe so.

9       Q    And you believe these are accurate copies of

13:49:38  10  your web pages?

11       A    I didn't check word -- word by word, but I

12  think so.

13       Q    Okay.

14           Are you familiar with an organization called

13:49:57  15  Internet Archive, located at Web.Archive.org,

16  Web.Archive.org?

17       A    I've heard of it.

18       Q    Have you ever used them?

19       A    Used them?  Recently.

13:50:16  20       Q    Okay.

21       A    Finding your information, I'm sure.

22       Q    Me, personally?

23       A    I think Sieber sent a letter or something like

24  that.  Mr. Sieber refer to that Archive.org Internet

13:50:38  25  archiving in one of his letters.

7d9734e9-5b37-4755-a751-18e5871db9b9

Page 161

15:16:05    1        A    It offers a helpful guide.

            2        Q    Okay.

            3        A    Some of the ideas are very similar, yes.

            4        Q    We talked a bit earlier about Distinct, which

15:16:26    5    was a competitor, correct?

            6        A    Yes.

            7        Q    And you also had a legal dispute with

            8    Distinct, correct?

            9        A    Yes.

15:16:39   10        Q    Okay.

           11             And Distinct actually accused Netbula at one

           12    point of infringing Distinct's intellectual property in

           13    its JavaRPC product; is that right?

           14        A    Yes, at one point they sent us a letter.

15:17:02   15        Q    Okay.

           16             And did you send them a response?

           17        A    Yes.

           18        Q    Okay.  This doesn't have copies.  Hang on.

           19             Well, we'll come back to that.  I just have my

15:17:39   20    copy in this folder for some reason.

           21             Let me ask just more generally, I believe

           22    we've already established that you are the only

           23    developer for the RPC products, there may have been some

           24    testing and documentation work.

15:18:02   25             But is that true from the beginning of

7d9734e9-5b37-4755-a751-18e5871db9b9

Page 236

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


NETBULA, LLC, a Delaware
limited liability company,

      Plaintiff,

vs.                                        No. C-06-0711-MJJ-WDB

BINDVIEW DEVELOPMENT CORPORATION,
a Texas corporation; SYMANTEC CORPORATION,
a Delaware corporation; ERIC J. PULASKI,
an individual; and DOES 1-10, inclusive,

      Defendants.

_____


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY PORTIONS

30(b)(6) VIDEOTAPE DEPOSITION OF DONGXIAO YUE

San Francisco, California

Thursday, June 28, 2007

VOLUME 2




Reported by:
KELLI COMBS
CSR No. 7705

Job No. 3-68376

Page 239

1                          INDEX

2      WITNESS                    EXAMINATION

3      DONGXIAO YUE

4              BY MR. WAKEFIELD          244

5      HIGHLY CONFIDENTIAL TESTIMONY BOUND SEPARATELY
                         PAGES
6                      428-449
                       458-461
7

8              EXHIBITS FOR IDENTIFICATION

       DEFENDANTS'                      PAGE
9

10     25   Web page from WindowsRPC.com website    244

11     26   Document titled "Netbula Secure         253
            order form"

12     27   Declaration                             265

13     28   Chinese-language website                268

14     29   Collection of Netbula invoices          271

15     30   Page from Netbula website,              307
            NB-0003585 and -3586
16
       31   Page from Netbula website,              315
17          NB-0003587 through -3589

18     32   Blog posting                            317

19     33   Blog posting                            318

20     34   Web page from SoftLookup.com titled     322
            "ONC RPC Free Download"
21
       35   E-mail exchange, NB-0005233             323
22
       36   E-mail exchange from 2000 with          338
23          Sales@Netbula.com, NB-0005144 and
            -5145
24
       37   E-mail to Netbula sales in March        340
25          2001, NB-0005035

Page 468

| | | |
|---|---|---|
| 16:26:03 | 1 | BY MR. WAKEFIELD: |
| | 2 | Q   Mr. Yue, you now have in front of you |
| | 3 | Exhibit 81, which refers to the Distinct dispute that |
| | 4 | you had in 1999. |
| 16:26:18 | 5 | Do you remember that? |
| | 6 | A   Yes. |
| | 7 | Q   And do you recognize this as a letter that you |
| | 8 | wrote? |
| | 9 | A   Yes. |
| 16:26:26 | 10 | Q   And this was in response to a claim by |
| | 11 | Distinct in a letter to you or to Netbula that Netbula |
| | 12 | infringed Distinct's copyright, right? |
| | 13 | A   Yes. |
| | 14 | Q   Is that a "yes"? |
| 16:26:44 | 15 | A   Yes. |
| | 16 | Q   And you responded that: |
| | 17 | "All Netbula products are |
| | 18 | developed independently by our |
| | 19 | developers." |
| 16:26:58 | 20 | Do you see that? |
| | 21 | A   Which paragraph? |
| | 22 | Q   It's the second paragraph. |
| | 23 | A   Yes. |
| | 24 | Q   And on the next page, -3838, the bottom of the |
| 16:27:16 | 25 | first paragraph of Exhibit 81, you say: |

Page 469

| | | |
|---|---|---|
| 16:27:26 | 1 | "Netbula JavaRPC is simply a |
| | 2 | ONC RPC port correctly done by our |
| | 3 | developers, the very ones who |
| | 4 | developed advanced products such as |
| 16:27:37 | 5 | PowerRPC." |
| | 6 | Do you see that? |
| | 7 | A    Which paragraph? |
| | 8 | Q    It's the second page.  It's the bottom of the |
| | 9 | first paragraph on that page, last sentence. |
| 16:27:57 | 10 | A    Bottom of the second paragraph? |
| | 11 | Q    First paragraph. |
| | 12 | A    Oh, yes. |
| | 13 | Q    So it says: |
| | 14 | "Netbula JavaRPC is simply a |
| 16:28:07 | 15 | ONC RPC port correctly done by our |
| | 16 | developers, the very ones who |
| | 17 | developed advanced products such as |
| | 18 | PowerRPC." |
| | 19 | A    Yes. |
| 16:28:16 | 20 | Q    And, in fact, you were the developer of |
| | 21 | PowerRPC? |
| | 22 | A    Yes. |
| | 23 | Q    There weren't other developers? |
| | 24 | A    By "developer," it could mean -- if you |
| 16:28:31 | 25 | include test engineers -- as I told you, another person |

Page 470

16:28:36    1    was involved in testing and other issues of the

            2    development.

            3        Q    And you point out that:

            4                  "Netbula JavaRPC is a straight

16:29:08    5             port of Sun Microsystems' open

            6             source ONC RPC."

            7             This is at the -- on the first page, third

            8    paragraph.

            9        A    Yes.

16:29:23   10        Q    And is that true?

           11        A    Depending on how you define "straight port,"

           12    that's true.

           13        Q    And is that also true of the PowerRPC and ONC

           14    RPC?

16:29:46   15        A    True of what?  Could you --

           16        Q    Is it true that, let's say, ONC RPC is a

           17    straight port of Sun Microsystems' open source ONC RPC

           18    published in 1988?

           19        A    Depends how you define "straight port."

16:30:03   20        Q    Okay.

           21             How do you define it in this letter that you

           22    sent to Distinct?

           23        A    In this letter, I was emphasizing -- of

           24    course, this -- Distinct was accusing us of copyright

16:30:17   25    infringement, so of course I was saying, "No, we didn't

Page 471

16:30:23  1    copy your guys, we didn't have your source code and it

2    was a port of Sun Microsystems' ONC RPC."

3            So I was emphasizing that part of the story

4    instead of, you know, make any copy of Distinct's

16:30:45  5    software.

6        Q    Okay.

7            And is the point --

8            In pointing that out, are you saying, "If

9    there are similarities between your product and ours, it

16:31:02  10   comes from the fact that they have the same common

11   ancestor, they are both from Sun"?

12       A    Yes.

13       Q    And you go on to say:

14           "There is almost a one-to-one

16:31:14  15           mapping between Sun's C code to

16           JavaRPC code.  Even the variable

17           names are the same in many cases."

18           Was that true when you wrote it?

19       A    This probably overstate a little bit the

16:31:34  20   similarity.  Of course, there are some file names that

21   are similar, also some variable names are the same.

22           But in terms of the code, source code, they

23   are, of course, substantially different.  They are quite

24   different.

16:31:55  25       Q    Okay.

Page 472

16:31:57  1          So you --

2               In this dispute, you were willing to overstate

3     your claims, the dispute with Distinct?

4          A    It depends on the interpretation of

16:32:09  5     "one-to-one mapping."

6               I gave a example below in this letter, saying,

7     for example, the file names -- for instance, Sun RPC,

8     there is CLNT_TCB.c and in JavaPC there is a

9     ClientTCB.Java.  So that's -- looks like in terms of

16:32:40  10    file name, they -- there was a mapping.

11              But the JavaRPC was written in Java and the

12    ONC RPC was written in C.  They are very different in

13    other aspects.

14         Q    Okay.

16:33:05  15             So in this letter, you were overstating the

16    similarities?

17         A    As I said, I was trying to emphasize that the

18    root of JavaRPC was from ONC RPC and any similarity

19    between Netbula's code and Distinct's code is just that

16:33:35  20    they share common ancestor.

21         Q    Okay.

22              In the --

23              If you look at page -3838, you say:  "If

24    Distinct is claiming patents...."

16:33:53  25             Do you see that?  It's the second paragraph on

Page 473

| | | |
|---|---|---|
| 16:33:57 | 1 | that second page. |
| | 2 | A    That's right. |
| | 3 | Q    (Reading) |
| | 4 |          "If Distinct is claiming |
| 16:34:01 | 5 | patents on any of the techniques or |
| | 6 | ideas" -- and you give some |
| | 7 | examples in parentheses -- you say, |
| | 8 | "feel free to take these obvious |
| | 9 | things to the patent office," |
| 16:34:16 | 10 | right? |
| | 11 | A    Yes. |
| | 12 | Q    And what's your point in making that |
| | 13 | distinction between "patent" -- |
| | 14 | A    I have to -- |
| 16:34:23 | 15 | Q    -- and "copyright"? |
| | 16 | A    Do you have the copy of Distinct's letter? |
| | 17 | Q    I know we have it somewhere, but -- |
| | 18 |          Well, let me ask the question.  Let me ask a |
| | 19 | different question. |
| 16:34:36 | 20 |          You understand that copyright does not protect |
| | 21 | techniques or ideas? |
| | 22 | A    That's my understanding at that time. |
| | 23 | Q    Okay. |
| | 24 |          Is that still your understanding? |
| 16:34:48 | 25 | A    Yes. |

16:34:48    1         Q    Okay.

            2              And so if there is a particular expression in

            3    the code, that may be protectable, but the technique or

            4    the idea of doing something is not protected by

16:35:03    5    copyright?

            6         A    Correct.

            7         Q    All right.

            8              So you testified earlier about license

            9    agreements -- we're done with that one -- and mentioned

16:35:34   10    that you believe that although you originally thought

           11    that the pre 2000 license identified as Exhibit 22 was

           12    likely the form of license in effect with Netect, there

           13    may be earlier licenses that were in effect; is that

           14    right?

16:35:56   15         A    Right.

           16         Q    Okay.  So let's see what these are.

           17                        (Defendants' Exhibit 82 marked

           18                         for identification.)

           19    BY MR. WAKEFIELD:

16:36:20   20         Q    Do you recognize Exhibit 82?

           21         A    Yes.

           22         Q    What is Exhibit 82?

           23         A    This says "Netbula Software License

           24    Agreement."

16:36:52   25         Q    And what was this document used for?

# EXHIBIT E

# CALIFORNIA

# RULES OF COURT

## FEDERAL

## 2002
## REVISED EDITION

INCLUDING AMENDMENTS RECEIVED
THROUGH JUNE 1, 2002



WEST GROUP
A THOMSON COMPANY

Mat. #40028987

# LOCAL RULES FOR ALTERNATIVE DISPUTE RESOLUTION

## RULE 1.  PURPOSE AND SCOPE OF RULES

### RULE 1–1.  TITLE

These are the Local Rules for Alternative Dispute Resolution in the United States District Court for the Northern District of California. They should be referred to as "ADR L.R. ___."

Eff. Sept. 1, 1995.

### RULE 1–2.  PURPOSE AND SCOPE

(a) **Purpose.** The Court recognizes that full, formal litigation of claims can impose large economic burdens on parties and can delay resolution of disputes for considerable periods. The Court also recognizes that sometimes an alternative dispute resolution procedure can improve the quality of justice by improving the parties' clarity of understanding of their case, their access to evidence, and their satisfaction with the process and result. The Court adopts these ADR Local Rules to make available to litigants a broad range of court-sponsored ADR processes to provide quicker, less expensive and potentially more satisfying alternatives to continuing litigation without impairing the quality of justice or the right to trial. The Court offers diverse ADR services to enable parties to use the ADR process that promises to deliver the greatest benefits to their particular case.

**Commentary**

The Alternative Dispute Resolution Act of 1998, 28 U.S.C. Sections 651–658, requires each federal district court to authorize by local rule the use of at least one ADR process in all civil actions. In accordance with § 651(c), the Court has examined the effectiveness of its ADR programs and has adopted improvements consistent with the Act.

(b) **Scope.** These ADR Local Rules are effective May 1, 2000 and shall govern actions pending or commenced on or after that date. These rules supplement the Civil Local Rules of the Court and, except as otherwise indicated, apply to all civil actions filed in this Court. Cases subject to these ADR Local rules also remain subject to the other local rules of the Court.

(c) **Magistrate Judges Consent Cases.** In cases in which the parties have consented to jurisdiction by a Magistrate Judge under 28 U.S.C. § 636(c), the Magistrate Judge shall have the full scope of powers that these ADR local rules confer on District Judges, including the authority to refer cases to ADR programs and to grant relief from the requirements of these ADR local rules.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 2.  GENERAL PROVISIONS

### RULE 2–1.  ADR UNIT

(a) **Staff and Responsibilities.** The ADR Unit shall consist of a Director of ADR Programs, ADR Program Counsel, ADR Administrator and such case administrators and support personnel as the Court may authorize. The ADR Director and ADR Program Counsel shall be attorneys with expertise in ADR procedures. The ADR Unit shall be responsible for designing, implementing, administering and evaluating the Court's ADR programs. These responsibilities extend to educating litigants, lawyers, Judges, and Court staff about the ADR program and rules. In addition, the ADR Unit shall be responsible for overseeing, screening and training neutrals to serve in the Court's ADR programs.

(b) **ADR Internet Site and Handbook.** The ADR Unit's Internet site, located at <www.adr.cand.uscourts.gov>, contains information about the Court's ADR processes and their comparative benefits, answers to frequently asked questions, various forms approved by the Court, and information about becoming a neutral in the Court's programs. Much of this information is also contained in a handbook entitled *Dispute Resolution Procedures in the Northern District of California* which is available from the Office of the Clerk.

(c) **Contacting the ADR Unit.** The address, phone and fax numbers, and e-mail address of the ADR Unit are:

U.S. District Court–ADR Unit
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102
Telephone: (415) 522–2199
Telephone for ADR Telephone Conferences only: (415) 522–4603
fax: (415) 522–4112
E–Mail: ADR@cand.uscourts.gov

**Commentary**

The Court encourages litigants and counsel to consult the ADR Internet site and to contact the ADR Unit to discuss the suitability of ADR options for their cases or for assistance in tailoring an ADR process to a specific case.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 2–2.  ADR MAGISTRATE JUDGE

The Court has appointed United States Magistrate Judge Wayne D. Brazil as the ADR Magistrate Judge. The ADR Magistrate Judge is responsible for overseeing the ADR Unit, consulting with the ADR Director and ADR Program Counsel on matters of policy, program design and evaluation, education, training and administration. The ADR Magistrate Judge shall rule on all requests to be excused from appearing in person at arbitration, ENE and mediation sessions, and shall hear and determine all complaints alleging violations of these ADR local rules. When necessary, the Chief District Judge will appoint another Magistrate Judge of this Court to perform, temporarily, the duties of the ADR Magistrate Judge.

Eff. Sept. 1, 1995.  As amended, eff. July 1, 1997; May 1, 2000.

## RULE 2–3.  REFERRAL TO ADR PROGRAM

**(a) At Filing.** As set forth in ADR L.R. 4–2, some cases, identified by objective criteria, shall be referred to the Court's non-binding arbitration program automatically at the time of the filing of the complaint or the notice of removal. Other cases, as set forth in ADR L.R. 3–3, shall be referred to the Court's ADR Multi-Option Program. The initial case management schedule issued at filing shall state whether a case has been referred to either arbitration or the ADR Multi-Option Program.

**(b) By Stipulation, Motion or Order.** Subject to pertinent jurisdictional and resource constraints, a case may be referred to a Court ADR process by order of the assigned Judge following a stipulation by all parties, by motion of a party under Civil L.R. 7, or on the Judge's initiative. A stipulation and proposed order selecting an ADR process shall (1) designate the specific ADR process the parties have selected, (2) specify the time frame within which the ADR process will be completed, and (3) set forth any other information the parties would like the Court to know. The parties may use the form provided by the Court.

#### Commentary

A form stipulation and proposed order appears in the Appendix to these local rules and is available on the ADR Internet site.

**(c) Relief from Automatic Referral.** Any party whose case has been referred automatically to nonbinding arbitration or the ADR Multi-Option program may file with the assigned Judge a motion for relief from automatic referral under Civil L.R. 7. The criteria under which the Judge will rule on such motions are specific to each program and are set forth below in ADR L.R. 3–5(e) and 4–2(c).

Eff. Sept. 1, 1995.  As amended, May 1, 2000.

## RULE 2–4.  VIOLATION OF THE ADR LOCAL RULES

**(a) Reporting Violation.**

(1) *Complaints Alleging Material Violations.* A complaint alleging that any person or party, including the neutral, has materially violated any of the ADR local rules other than ADR L.R. 7 (pertaining to judicially hosted settlement conferences) shall be presented in writing *and under seal* directly to the ADR Magistrate Judge. Such a letter of complaint must be accompanied by a competent declaration. Copies of the letter of complaint and declaration must be sent contemporaneously to all other parties, the neutral (if identified) and the ADR Unit. The letter of complaint and declaration shall not be filed and shall not be presented to the assigned Judge.

(2) *Report by Neutral.* An arbitrator, evaluator, or mediator who perceives a material violation of these ADR local rules shall make a written report *under seal* directly to the ADR Magistrate Judge and contemporaneously provide copies to all counsel and to the ADR Unit. Such report shall not be filed and shall not be presented to the assigned Judge.

**(b) Proceeding in Response to Complaint or Report of Violation and Sanctions.** If, upon receiving an appropriately presented and supported complaint or report of a material violation of these ADR local rules, the ADR Magistrate Judge determines that the matter warrants further proceedings, the ADR Magistrate Judge shall issue an order to show cause why sanctions should not be imposed. Any such proceedings shall be conducted on the record but under seal. The ADR Magistrate Judge will afford all interested parties an opportunity to be heard before deciding whether to impose sanctions. Any objections to such sanctions shall be made by motion under Civil L.R. 7 before the General Duty Judge, unless the General Duty Judge is the assigned Judge, in which case the objections shall be made to the Chief Judge. Any such objection shall be delivered to the appropriate Judge within ten days of notice of the sanctions, shall not be filed, and shall be served immediately on the ADR Magistrate Judge, all other counsel, the neutral and the ADR unit.

**(c) Confidentiality.** Absent a waiver of confidentiality by all necessary persons, or an order of the Court, submissions made under this rule shall not disclose confidential ADR communications.

#### Cross Reference

See ADR L.R. 5–12 and 6–11 governing confidentiality in ENE and mediation, respectively.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

## RULE 2–5. NEUTRALS

(a) **Panel.** The ADR Unit shall maintain a panel of neutrals serving in the Court's ADR programs. Neutrals will be selected from time to time by the Court from applications submitted by lawyers willing to serve or by other persons as set forth in section (b)(3) below. The ADR Director and ADR Program Counsel may serve as neutrals.

(b) **Qualifications and Training.** Each lawyer serving as a neutral in a Court ADR program shall be a member of the bar of this Court or a member of the faculty of an accredited law school and shall successfully complete initial and periodic training as required by the Court. Additional minimum requirements for serving on the Court's panel of neutrals, which the Court may modify in individual circumstances for good cause, are as follows:

(1) *Arbitrators.* Arbitrators shall have been admitted to the practice of law for at least 10 years and shall have:

(A) For not less than five years, committed 50% or more of their professional time to matters involving litigation; or

(B) Substantial experience serving as a neutral in dispute resolution proceedings.

(2) *ENE Evaluators.* Evaluators shall have been admitted to the practice of law for at least 15 years and have considerable experience with civil litigation in federal court. Evaluators shall also have substantial expertise in the subject matter of the cases assigned to them and shall have the temperament and training to listen well, facilitate communication across party lines and, if called upon, assist the parties with settlement negotiations.

(3) *Mediators.* Generally, mediators shall have been admitted to the practice of law for at least 7 years and shall be knowledgeable about civil litigation in federal court. Mediators shall have strong mediation process skills and the temperament and training to listen well, facilitate communication across party lines and assist the parties with settlement negotiations. Mediators who are not lawyers may also be selected to serve on the Court's panel of mediators if they have appropriate professional credentials in another discipline and are knowledgeable about civil litigation in federal court. A non-lawyer mediator may be appointed to a case only with the consent of the parties.

(c) **Oath.** Persons serving as neutrals in any of the Court's ADR programs shall take the oath or affirmation prescribed in 28 U.S.C. § 453.

(d) **Disqualification of Neutrals.**

(1) *Applicable Standards.* No person may serve as a neutral in a case in a Court ADR program in violation of:

(A) the standards set forth in 28 U.S.C. § 455, or

(B) any applicable standard of professional responsibility or rule of professional conduct, or

(C) other guidelines adopted by the Court concerning disqualification of neutrals.

(2) *Mandatory Disqualification and Notice of Recusal.* A prospective neutral who discovers a circumstance requiring disqualification shall immediately notify the parties and the ADR Unit in writing. The parties may not waive a basis for disqualification that is described in 28 U.S.C. Section 455 (b).

(3) *Disclosure and Waiver of Non-Mandatory Grounds for Disqualification.* If a prospective neutral discovers a circumstance that would not compel disqualification under an applicable standard of professional responsibility or rule of professional conduct or other guideline, or under § 455(b), but that might be covered by § 455 (a), the neutral shall promptly disclose that circumstance to all counsel in writing, as well as the ADR Unit. A party who has an objection to the neutral based upon an allegation that the neutral has a conflict of interest shall present this objection in writing to the ADR Unit within 10 calendar days of learning the source of the potential conflict or shall be deemed to have waived objection.

(4) *Objections Not Based on Disclosures by Neutral.* Within ten days of learning the identity of a proposed neutral, a party who objects to service by that neutral must deliver to the ADR Unit and to all other counsel a writing that specifies the bases for the objection. The ADR Director shall determine whether the proposed neutral will serve or whether another neutral should be appointed. Appeal from such a determination must be made directly to the ADR Magistrate Judge within five days of the notice of the ADR Director's determination.

(e) **Immunities.** All persons serving as neutrals in any of the Court's ADR programs are performing quasi-judicial functions and are entitled to the immunities and protections that the law accords to persons serving in such capacity.

Eff. Sept. 1, 1995. As amended, eff. May 1, 2000.

## RULE 2–6. EVALUATION OF ADR PROGRAMS

Congress has mandated that the Court's ADR programs be evaluated. Neutrals, counsel and clients shall promptly respond to any inquiries or questionnaires from persons authorized by the Court to evaluate the programs. Responses to such inquiries will be used for research and monitoring purposes only and the sources of specific information will not be disclosed to the assigned Judge or in any report.

Eff. Sept. 1, 1995.

# RULE 3.   ADR MULTI–OPTION PROGRAM

## RULE 3–1.   PURPOSE

The ADR Multi–Option Program is designed to encourage litigants in a broad range of cases to use ADR and to provide parties with sophisticated assistance in identifying the ADR process that is best suited to their particular case.

Eff. Sept. 1, 1995.

## RULE 3–2.   SUMMARY DESCRIPTION

Litigants in certain cases designated when the complaint or notice of removal is filed are presumptively required to participate in one non-binding ADR process offered by the Court (Arbitration, Early Neutral Evaluation, or Mediation) or, with the assigned Judge's permission, may substitute an ADR process offered by a private provider. Unless they have stipulated to an ADR process, counsel may be required to participate in a joint phone conference with the Court's ADR Director or ADR Program Counsel to consider the suitability of the ADR options for their case. When litigants have not stipulated to an ADR process before the case management conference, the assigned Judge will discuss the ADR options with counsel at that conference. If the parties cannot agree on a process before the end of the case management conference, the Judge will select one of the ADR processes offered by the Court, or may refer the case to a settlement conference hosted by a Magistrate Judge, unless persuaded that no ADR process is likely to deliver benefits to the parties sufficient to justify the resources consumed by its use.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

### Cross Reference

See Case Management Conference provisions of Civil L.R. 16.

## RULE 3–3.   ASSIGNMENT TO ADR MULTI–OPTION PROGRAM

(a) **Automatic Assignment.** Appropriate civil cases may be assigned to the ADR Multi–Option Program by the Clerk when the complaint or notice of removal is filed. Notice of such assignment will be given in the initial case management schedule issued to the filing or removing party.

(b) **By Stipulation, Motion or Order.** Cases not assigned at filing may be assigned to the ADR Multi–Option Program by order of the assigned Judge following a stipulation by all parties, on motion by a party under Civil L.R. 7, or on the Judge's initiative.

Eff. Sept. 1, 1995.

## RULE 3–4.   ADR OPTIONS

(a) **Court–Sponsored ADR Processes.** The Court-sponsored ADR options for cases assigned to the ADR Multi–Option Program include:

(1) Non-binding Arbitration;

(2) Early Neutral Evaluation (ENE); and

(3) Mediation.

(b) **Private ADR.** A private ADR procedure, to be conducted within the time frames set forth in these ADR local rules, may be substituted for a Court program if the parties so stipulate and the assigned Judge approves. Private ADR proceedings, however, are not subject to the enforcement, immunity or other provisions of the ADR Local Rules.

(c) **Early Settlement Conference with a Magistrate Judge.** A case may be referred to a settlement conference only by order of the assigned Judge.

Eff. Sept. 1, 1995. As amended, May 1, 2000.

## RULE 3–5.   SELECTING AN ADR PROCESS

(a) **Meet and Confer to Select ADR Process.** In cases assigned to the ADR Multi–Option Program, as soon as feasible after filing or removal and no later than the deadline to meet and confer, counsel shall confer to attempt to agree on an ADR process.

(b) **ADR Certification.** Unless otherwise ordered, no later than the date specified in the Initial Case Management Scheduling Order, counsel and client shall sign, serve and file an ADR Certification and shall provide a copy to the ADR Unit. The certification shall be filed on a form established for that purpose by the Court and in conformity with the instructions approved by the Court. If the client is a government or government agency, the certificate shall be signed by a person who meets the requirements of Civil L.R. 3–9(c). Counsel and client shall certify that both have:

(1) Read the handbook entitled *"Dispute Resolution Procedures in the Northern District of California"* or the portions of the ADR Unit's Internet site <www.adr.cand.uscourts.gov> specified on the site as necessary to comply with this Local Rule;

(2) Discussed the available dispute resolution options provided by the Court and private entities; and

(3) Considered whether their case might benefit from any of the available dispute resolution options.

(c) **Stipulation.** If counsel agree to participate in a Court-sponsored non-binding arbitration, ENE or me-

diation, or in private ADR, they shall file with their ADR Certification a form Stipulation and Proposed Order selecting an ADR process.

**(d) Notice of Need for ADR Phone Conference.** If counsel are unable to agree on the selection of an ADR process, or if counsel agree tentatively that they would prefer an early settlement conference with a Magistrate Judge, they shall file with their ADR Certification a Notice of Need for ADR Phone Conference.

**(e) Submission to ADR Unit.** A copy of the ADR Certification, along with either a Stipulation and Proposed Order selecting an ADR Process or a Notice of Need for ADR Phone Conference shall be *received* by the ADR Unit no later than the deadline set forth in the Initial Case Management Scheduling Order and may be submitted by fax to (415) 522–4112.

**(f) Selection Through ADR Phone Conference.** In cases assigned to the ADR Multi–Option Program where the parties have filed with their ADR Certification a Notice of Need for ADR Phone Conference, counsel are required to participate in a joint ADR Phone Conference at a time designated by the Court. During the phone conference, the ADR Director or ADR Program Counsel will help counsel identify the ADR process that is likely to benefit their particular case the most. The following procedures shall apply to the ADR Phone Conference:

(1) *Participants.* Counsel who will be primarily responsible for handling the trial of the matter shall participate in the conference. Clients and their insurance carriers are encouraged to participate as well. Counsel may request an in-person ADR conference at the Court in lieu of the phone conference by calling the ADR Unit.

(2) *Placing the Conference Call.* Counsel for the first-listed plaintiff in the case caption shall arrange for and place the phone conference by calling all other counsel and then the ADR phone conference number, (415) 522–4603, at the appointed time. The Court will reserve one-half hour for each such conference call.

(3) *Preparation.* Before the phone conference, counsel shall review with their clients these ADR Local Rules, the handbook entitled *Dispute Resolution Procedures in the Northern District of California* or the designated portions of the ADR Internet site.

(4) *Request to Continue the ADR Phone Conference.* Requests to continue the ADR Phone Conference shall be directed to the ADR Unit at (415) 522–2199.

(5) *Stipulation Following ADR Phone Conference.* Parties who stipulate to an ADR process after the phone conference may do so on a form provided by the Court pursuant to ADR L.R. 3–5(b) or in their case management statement, or may file a separate stipulation and proposed order pursuant to ADR L.R. 2–3(b). Counsel shall send a copy of the stipulation to the ADR Unit.

**(g) Selection at Case Management Conference.**

(1) *Consideration of ADR Processes.* If the parties do not stipulate to a particular ADR process before the case management conference, the assigned Judge will discuss with the parties the selection of an option at that conference. The ADR Director or ADR Program Counsel may consult with the Judge before the case management conference and may recommend a specific ADR option for the case.

(2) *Selection by Stipulation or Order.* If the parties agree to a particular ADR process at the case management conference and the assigned Judge approves, the Judge will issue an order referring the case to that process. If the parties do not agree to an ADR process, and the Judge deems it appropriate, he or she will select one of the Court ADR processes (non-binding arbitration, subject to statutory jurisdictional constraints; ENE; or mediation) and issue an order referring the case to that process. Alternatively, the Judge may issue an order referring the case to an early settlement conference.

(3) *Exemption.* If the parties persuade the Judge at the case management conference that no ADR process is likely to deliver benefits to the parties sufficient to justify the resources consumed by its use, the Judge will exempt the case from participating in any ADR process.

#### Commentary

Samples of the form ADR Certification, Stipulation and Proposed Order Selecting an ADR Process, and Notice of Need for ADR Phone Conference are found in the Appendix to these Rules and may be accessed on the ADR Internet site.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 3–6. TIMING OF ADR PROCESS IN THE ADR MULTI–OPTION PROGRAM

Unless otherwise ordered, the timing of the ADR process is governed by the ADR Local Rule specific to each process.

#### Cross-Reference

See ADR L.R. 4–5, 5–4, and 6–4.

Eff. Sept. 1, 1995. As amended May 1, 2000.

# RULE 4.   NON–BINDING ARBITRATION

## RULE 4-1.   DESCRIPTION

Arbitration under this local rule is an adjudicative process in which an arbitrator or a panel of three arbitrators issues a non-binding judgment ("award") on the merits after an expedited, adversarial hearing. Either party may reject the non-binding award and request a trial de novo. An arbitration occurs earlier in the life of a case than a trial and is less formal and less expensive. Because testimony is taken under oath and is subject to cross-examination, arbitration can be especially useful in cases that turn on credibility of witnesses. Arbitrators do not facilitate settlement discussions.

Eff. Sept. 1, 1995.  As amended, May 1, 2000.

## RULE 4-2.   AUTOMATIC REFERRAL TO ARBITRATION

(a) Eligible Cases. Pursuant to 28 U.S.C. § 654, any of the following civil actions seeking only money damages in an amount not exceeding $150,000, exclusive of punitive damages, interest, costs and attorney fees, and which do not allege violations of civil or constitutional rights, may be referred automatically by the Clerk to the arbitration program at filing:

(1) *When United States is Not a Party.* Actions founded on diversity of citizenship (28 U.S.C. § 1332), federal question (28 U.S.C. § 1331), admiralty or maritime jurisdiction (28 U.S.C. § 1333), and which arise under a contract or written instrument or out of personal injury or property damage.

(2) *When United States is a Party.* Actions which arise under the Federal Tort Claims Act (28 U.S.C. § 2671, et seq.); the Longshoremen's and Harbor Workers Act (33 U.S.C. § 901, et seq.); the Miller Act (40 U.S.C. § 270b), when the United States has no monetary interest in the claim; or the Suits in Admiralty Act (46 U.S.C. § 741, et seq., § 781 et seq.) which involve no general average.

#### Commentary

The Alternative Dispute Resolution Act of 1998 authorizes referral of cases to arbitration (28 U.S.C. § 654). Section 654(d) authorizes the continuation of this Court's pre-existing arbitration program under which cases are automatically assigned, at the time of filing, to arbitration without consent of the parties.

(b) Determination of Monetary Claim.

(1) *Separate Certification.* In all cases otherwise subject to arbitration under this rule, the Court shall presume the damages claim to be for less than $150,000, exclusive of punitive damages, interest, costs and attorney fees, unless counsel asserting the claim files a separate certification that the damages reasonably recoverable exceed $150,000, exclusive of punitive damages, interest, costs and attorney fees. Any such certification must be filed by plaintiff within 30 days after the case was filed in this Court or by defendant at the time of filing a counterclaim or cross-claim.

(2) *Determination.* Notwithstanding the amount of damages alleged in a party's pleading or certification under ADR L.R. 4-2(b)(1), the assigned Judge may, acting sua sponte or in response to a motion under Civil L.R. 7, and after affording the parties an opportunity to be heard, require arbitration if satisfied that recoverable damages cannot reasonably exceed $150,000, exclusive of punitive damages, interest, costs and attorney fees.

(c) Relief from Automatic Referral.

(1) *Selection of Different ADR Process.* The assigned Judge will exempt a case from arbitration upon the filing, no later than 60 days after the case was filed, or within 20 days after the defendant's first appearance, of a stipulation and proposed order, under ADR L.R. 2-3(b), to mediation, ENE, or private ADR.

(2) *Exemption.* The assigned Judge may, sua sponte or on motion by any party under Civil L.R. 7 brought within 20 days after the moving party's first appearance, exempt any case from arbitration if the objectives of arbitration would not be realized because:

(a) The case involves complex or novel legal issues;

(b) Legal issues predominate over factual issues; or

(c) For other good cause shown.

Eff. Sept. 1, 1995.  As amended, May 1, 2000.

## RULE 4-3.   REFERRAL BY STIPULATION

A case that does not meet the criteria for automatic referral to arbitration at filing as set forth in ADR L.R. 4-2 may be referred to arbitration by order of the assigned Judge only upon the written consent of all parties. Consent must be given freely and knowingly and no party or attorney in any such case may be prejudiced for refusing to consent to participate in arbitration. If consent is given by fewer than all parties, no Judge to whom the case might be assigned shall be advised of the identity of any party or attorney who elected not to consent to arbitration.

Eff. Sept. 1, 1995.As amended, eff. May 1, 2000.

## RULE 4-4.   ARBITRATORS

(a) Selection. After entry of an order referring the case to arbitration, and after the expiration of time for

filing a motion under ADR L.R. 4-2(c) to exempt the case from arbitration, the Clerk shall promptly furnish to each party a list of ten arbitrators randomly selected from the Court̲s panel. The parties shall then confer in the following manner to select a single arbitrator or, if all parties so request in writing, a panel of three arbitrators:

(1) *Striking Names.* Each side shall be entitled to strike two names from the list, plaintiff(s) to strike the first name, defendant(s) the next, then plaintiff(s) and then defendant(s).

(2) *Ranking Names.* The parties shall then select the arbitrator or panel from the remaining six names by alternately selecting one name; defendant(s) to make the first choice, plaintiff(s) the next, and continuing in this fashion.

(3) *Submitting List.* Within ten days of receipt of the original list of ten names, the parties shall list the six names in the order selected and submit them to the Clerk. If the parties fail to submit such a list within the prescribed time, the Clerk shall select an arbitrator at random from the original list of ten names.

(4) *Notification by Clerk.* The Clerk shall promptly notify the person or persons whose names appear as the parties' first choice or choices of their selection, or, if the parties have not chosen, the person(s) the Clerk has selected. If any person so selected is unable or unwilling to serve, the Clerk shall notify the person whose name appears next on the list. If the Clerk is unable to select an arbitrator or constitute a panel of arbitrators from the six selections, the process of selection under this Rule shall be repeated. When the requisite number of arbitrators has agreed to serve, the Clerk shall promptly send written notice of the selections to the arbitrator(s) and to the parties. The rules governing conflicts of interest and the procedure for objecting to an arbitrator are set forth in ADR L.R. 2-5(d). When a panel of three arbitrators is selected, the Clerk shall designate the person to serve as the panel's presiding arbitrator.

(b) **Compensation.** Arbitrators shall be paid by the Court $250 per day or portion of each day of hearing in which they serve as a single arbitrator or $150 for each day or portion of each day in which they serve as a member of a panel of three. No party may offer or give the arbitrator(s) any gift.

(c) **Payment and Reimbursement.** When filing an award, arbitrators shall submit a voucher on the form prescribed by the Clerk for payment of compensation and for reimbursement of any reasonable transportation expenses necessarily incurred in the performance of duties under this Rule. No reimbursement will be made for any other expenses.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 4-5.  TIMING AND SCHEDULING THE HEARING

(a) **Scheduling by Arbitrator.** Promptly after being appointed to a case, the arbitrator(s) shall arrange for the pre-session phone conference under ADR L.R. 4-8 and, after consulting with all parties, shall fix the date and place for the arbitration not less than 10 days after the phone conference and within the deadline fixed by the assigned judge, or if no such deadline is fixed, within 70 days after the phone conference. Counsel shall respond promptly to and cooperate fully with the arbitrator(s) with respect to scheduling the pre-session phone conference and the arbitration hearing. The hearing date shall not be continued or vacated except for emergencies as established in writing and approved by the assigned Judge. If the case is resolved before the hearing date, or if due to an emergency a participant cannot attend the arbitration, counsel shall notify the arbitrator and the ADR Unit immediately upon learning of such settlement or emergency.

(b) **Place and Time.** The hearing may be held at any location within the Northern District of California selected by the arbitrator(s), including a room at a federal courthouse, if available. In selecting the location, the arbitrator(s) shall consider the convenience of the parties and witnesses. Unless the parties agree otherwise, the hearing shall be held during normal business hours.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 4-6.  EX PARTE CONTACT PROHIBITED

Except with respect to scheduling matters, there shall be no ex parte communications between parties or counsel and an arbitrator.

Eff. Sept. 1, 1995. Renumbered, eff. May 1, 2000.

## RULE 4-7.  WRITTEN ARBITRATION STATEMENTS

(a) **Time for Submission.** No later than 10 calendar days before the arbitration session, each party shall submit directly to the arbitrator(s), and shall serve on all other parties, a written arbitration statement.

(b) **Prohibition against Filing.** The statements shall not be filed and the assigned Judge shall not have access to them.

(c) **Content of Statement.** The statements shall be concise and shall:

(1) Summarize the claims and defenses;

(2) Identify the significant contested factual and legal issues, citing authority on the questions of law;

(3) Identify proposed witnesses; and

(4) Identify, by name and title or status, the person(s) with decision-making authority, who, in addition to counsel, will attend the arbitration as representative(s) of the party.

**(d) Modification of Requirement by Arbitrator(s).** After jointly consulting counsel for all parties, the arbitrator(s) may modify or dispense with the requirements for the written arbitration statements.

Eff. Sept. 1, 1995.  Renumbered, eff. May 1, 2000.

## RULE 4–8.  TELEPHONE CONFERENCE BEFORE ARBITRATION

The arbitrator(s) shall schedule a brief joint telephone conference with counsel before the arbitration to discuss matters such as the scheduling of the arbitration, the procedures to be followed, whether supplemental written material should be submitted, which witnesses will attend, how testimony will be presented, including expert testimony, and whether and how the arbitration will be recorded.

Eff. Sept. 1, 1995.  Renumbered and amended, eff. May 1, 2000.

## RULE 4–9.  ATTENDANCE AT ARBITRATION

**(a) Parties.** Each party shall attend the arbitration hearing unless excused under paragraph (d), below. This requirement reflects the Court's view that principal values of arbitration include affording litigants an opportunity to articulate their positions and to hear, first hand, both their opponent's version of the matters in dispute and a neutral assessment of the merits of the case.

(1) *Corporation or Other Entity.* A party other than a natural person (e.g., a corporation or an association) satisfies this attendance requirement if represented by a person (other than outside counsel) who is knowledgeable about the facts of the case.

(2) *Government Entity.* A party that is a government or governmental agency, in addition to counsel, shall send a representative knowledgeable about the facts of the case and the governmental unit's position. If the action is brought by the government on behalf of one or more individuals, at least one such individual also shall attend.

**(b) Counsel.** Each party shall be accompanied at the arbitration session by the lawyer who will be primarily responsible for handling the trial of the matter.

**(c) Request to be Excused.** A person who is required to attend an arbitration hearing may be excused from attending in person only after a showing that personal attendance would impose an extraordinary or otherwise unjustifiable hardship. A person

seeking to be excused must submit, no fewer than 15 days before the date set for the arbitration, a letter to the ADR Magistrate Judge, simultaneously copying the ADR Unit, all other counsel and the arbitrator(s). The letter shall:

(1) Set forth with specificity all considerations that support the request;

(2) State realistically the amount in controversy in the case;

(3) Indicate whether the other party or parties join in or object to the request; and

(4) Be accompanied by a proposed order.

**(d) Participation by Telephone.** A person excused from attending an arbitration in person shall be available to participate by telephone.

Eff. Sept. 1, 1995.  Renumbered and amended, eff. May 1, 2000.

## RULE 4–10.  AUTHORITY OF ARBITRATORS AND PROCEDURES AT ARBITRATION

**(a) Authority of Arbitrators.** Subject to the provisions of these ADR local rules, arbitrators shall be authorized to:

(1) Administer oaths and affirmations;

(2) Make reasonable rulings as are necessary for the fair and efficient conduct of the hearing; and

(3) Make awards.

**(b) Prohibition on Facilitating Settlement Discussions.** Arbitrators are not authorized to facilitate settlement discussions. If the parties desire assistance with settlement, the parties or arbitrator(s) may request that the case be referred to mediation, ENE, or a settlement conference.

**(c) Presumption against Bifurcation.** Except in extraordinary circumstances, the arbitrator(s) shall not bifurcate the arbitration.

**(d) Quorum.** Where a panel of three arbitrators has been named, any two members of a panel shall constitute a quorum, but the concurrence of a majority of the entire panel shall be required for any action or decision by the panel, unless the parties stipulate otherwise.

**(e) Testimony.**

(1) *Subpoenas.* Attendance of witnesses and production of documents may be compelled in accordance with FRCivP 45.

(2) *Oath and Cross-examination.* All testimony shall be taken under oath or affirmation and shall be subject to such reasonable cross-examination as the circumstances warrant.

(3) *Evidence.* In receiving evidence, the arbitrator(s) shall be guided by the Federal Rules of Evi-

dence, but shall not thereby be precluded from receiving evidence which the arbitrator(s) consider(s) relevant and trustworthy and which is not privileged.

**(f) Transcript or Recording.** A party may cause a transcript or recording of the proceedings to be made but shall provide a copy to any other party who requests it and who agrees to pay the reasonable costs of having a copy made.

**(g) Default of Party.** The unexcused absence of a party shall not be a ground for continuance, but damages shall be awarded against an absent party only upon presentation of proof thereof satisfactory to the arbitrator(s).

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 4-11. AWARD AND JUDGMENT

**(a) Form of Award.** An award shall be made after an arbitration under this Rule. Such an award shall state clearly and concisely the name or names of the prevailing party or parties and the party or parties against which it is rendered, and the precise amount of money, if any, awarded. It shall be in writing and (unless the parties stipulate otherwise) be signed by the arbitrator or by at least two members of a panel. No arbitrator shall participate in the award without having attended the hearing. Costs within the meaning of FRCivP 54 and Civil L.R. 54 may be assessed by the arbitrator(s) as part of an arbitration award.

**(b) Filing and Serving the Award.** Within 10 days after the arbitration hearing is concluded, the arbitrator(s) shall file the award with the Clerk in an unsealed envelope with a cover sheet stating: "Arbitration Award to be filed under seal pursuant to ADR L.R. 4-11—not to be forwarded to the Assigned Judge." The cover sheet shall also list the case caption, case number and name(s) of the arbitrator, but shall not specify the content of the award. The Clerk shall promptly serve copies of the arbitration award on the parties. In addition, immediately after receiving a copy of the arbitration award, the party that prevailed in the arbitration shall serve a copy of the award on the other parties and shall promptly file proof of said service under Civil L.R. 5, but shall not attach a copy of the award.

**(c) Sealing of Award.** Each filed arbitration award shall promptly be sealed by the Clerk. The award shall not be disclosed to any Judge who might be assigned to the case until the Court has entered final judgment in the action or the action has been otherwise terminated, except as necessary to assess costs or prepare the report required by Section 903(b) of the Judicial Improvements and Access to Justice Act.

**(d) Entry of Judgment on Award.** If no party has filed a demand for trial de novo (or a notice of appeal, which shall be treated as a demand for trial de novo) within 30 days of notice of the filing of the arbitration award, the Clerk shall enter judgment on the arbitration award in accordance with FRCivP 58. A judgment so entered shall be subject to the same provisions of law and shall have the same force and effect as a judgment of the Court in a civil action, except that the judgment shall not be subject to review in any other court by appeal or otherwise.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 4-12. TRIAL DE NOVO

**(a) Time for Demand.** If any party files and serves a demand for trial de novo within 30 days of notice of the filing of the arbitration award, no judgment thereon shall be entered by the Clerk and the action shall proceed in the normal manner before the assigned Judge. Failure to file and serve a demand for trial de novo within this 30-day period waives the right to trial de novo.

**(b) Limitation on Admission of Evidence.** At the trial de novo the Court shall not admit any evidence indicating that there has been an arbitration proceeding, the nature or amount of any award, or any other matter concerning the conduct of the arbitration proceeding, unless:

(1) The evidence would otherwise be admissible in the trial under the Federal Rules of Evidence, or

(2) The parties have otherwise stipulated.

**(c) Award Not to be Attached.** A party filing a demand for a trial de novo shall not attach the arbitration award.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 4-13. STIPULATION TO BINDING ARBITRATION

At any time before the arbitration hearing, the parties may stipulate in writing to waive their rights to request a trial de novo pursuant to ADR L.R. 4-12. Such stipulation shall be submitted to the assigned Judge for approval and shall be filed. In the event of such stipulation, judgment shall be entered on the arbitration award pursuant to ADR L.R. 4-11(d).

Adopted, eff. July 1, 1997. Renumbered and amended, eff. May 1, 2000.

## RULE 4-14. FEDERAL ARBITRATION ACT PRESUMPTIVELY INAPPLICABLE

Nothing in these ADR Local Rules limits any party's right to agree to arbitrate any dispute, regardless

of the amount, pursuant to Title 9, United States Code, or any other provision of law.

Former Rule 4–14 eff. Sept. 1, 1995. Renumbered as Rule 4–15, eff. July 1, 1997. Renumbered and amended, eff. May 1, 2000.

# RULE 5.   EARLY NEUTRAL EVALUATION

## RULE 5–1.   DESCRIPTION

In Early Neutral Evaluation (ENE) the parties and their counsel, in a confidential session, make compact presentations of their claims and defenses, including key evidence as developed at that juncture, and receive a non-binding evaluation by an experienced neutral lawyer with subject matter expertise. The evaluator also helps identify areas of agreement, offers case-planning suggestions and, if requested by the parties, settlement assistance.

Eff. Sept. 1, 1995. As amended, eff. May 1, 2000.

## RULE 5–2.   ELIGIBLE CASES

Subject to the availability of administrative resources and of an evaluator with subject matter expertise, appropriate civil cases may be referred to ENE by order of the assigned Judge following a stipulation by all parties, on motion by a party under Civil L.R. 7, or on the Judge's initiative.

### Cross Reference

See ADR L.R. 2–3(b).

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 5–3.   EVALUATORS

(a) **Appointment.** After entry of an order referring a case to ENE, the ADR Unit will appoint from the Court's panel an evaluator who has expertise in the subject matter of the lawsuit, is available during the appropriate period and has no apparent conflict of interest. The Court will notify the parties of the appointment. The rules governing conflicts of interest and the procedure for objecting to an evaluator on that basis are set forth in ADR L.R. 2–5(d).

(b) **Compensation.** ENE evaluators shall volunteer their preparation time and the first four hours in an ENE session. After four hours in an ENE session, the evaluator may either (1) continue to volunteer his or her time or (2) give the parties the option of concluding the procedure or paying the evaluator for additional time at an hourly rate of $200. The ENE procedure will continue only if all parties and the evaluator agree. After eight hours in one or more ENE sessions, if all parties agree, the evaluator may charge his or her hourly rate or such other rate that all parties agree to pay. In special circumstances for complex cases requiring substantial preparation time, the par-

ties and the evaluator may make other arrangements with the approval of the ADR Director or ADR Program Counsel. No party may offer or give the evaluator any gift.

(c) **Payment.** All terms and conditions of payment must be clearly communicated to the parties. The parties may agree to pay the fee in other than equal portions. The parties shall pay the evaluator directly. On a questionnaire form provided by the Court, the evaluator shall promptly report to the ADR Unit the amount of any payment received.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997. Renumbered and amended, eff. May 1, 2000.

## RULE 5–4.   TIMING AND SCHEDULING THE ENE SESSION

(a) **Scheduling by Evaluator.** Promptly after being appointed to a case, the evaluator shall arrange for the pre-session phone conference under ADR L.R. 5–7 and, after consulting with all parties, shall fix the date and place of the ENE session within the deadlines set by paragraph (b) below, or the order referring the case to ENE. Counsel shall respond promptly to and cooperate fully with the evaluator with respect to scheduling the pre-session phone conference and the ENE session.

(b) **Deadline for Conducting Session.** Unless otherwise ordered, the ENE session shall be held within 90 days after the initial case management conference or the issuance of the initial case management order, whichever occurs first.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997. Renumbered and amended, eff. May 1, 2000.

## RULE 5–5.   REQUESTS TO EXTEND DEADLINE

(a) **Motion Required.** Requests for extension of the deadline for conducting an ENE session shall be made no later than 15 days before the session is to be held and shall be directed to the assigned Judge, in a motion under Civil L.R. 7, with a copy to the other parties, the evaluator (if appointed) and the ADR Unit.

(b) **Content of Motion.** Such motion shall:

(1) Detail the considerations that support the request;

(2) Indicate whether the other parties concur in or object to the request; and

(3) Be accompanied by a proposed order setting forth a new deadline by which the ENE session shall be held.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 5–6.  EX PARTE CONTACT PROHIBITED

Except with respect to scheduling matters, there shall be no ex parte communications between parties or counsel and the evaluator, including private caucuses to discuss settlement, until after the evaluator has committed his or her evaluation to a writing and all parties have agreed that ex parte communications with the evaluator may occur.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 5–7.  TELEPHONE CONFERENCE BEFORE ENE SESSION

The evaluator shall schedule a brief joint telephone conference with counsel before the ENE session to discuss matters such as the scheduling of the ENE session, the procedures to be followed, the nature of the case, and which client representatives will attend.

Eff. Sept. 1, 1995. Renumbered, eff. May 1, 2000.

## RULE 5–8.  WRITTEN ENE STATEMENTS

(a) **Time for Submission.** No later than 10 calendar days before the first ENE session, each party shall submit directly to the evaluator, and shall serve on all other parties, a written ENE Statement.

(b) **Prohibition Against Filing.** The statements shall not be filed and the assigned Judge shall not have access to them.

(c) **Content of Statement.** The statements shall be concise, may include any information that may be useful to the evaluator, and shall:

(1) Identify, by name and title or status:

(A) The person(s) with decision-making authority, who, in addition to counsel, will attend the ENE session as representative(s) of the party, and

(B) Persons connected with a party opponent (including an insurer representative) whose presence might substantially improve the utility of the ENE session or the prospects for settlement;

(2) Describe briefly the substance of the suit, addressing the party's views of the key liability issues and damages and discussing the key evidence;

(3) Address whether there are legal or factual issues whose early resolution would reduce significantly the scope of the dispute or contribute to settlement negotiations;

(4) Identify the discovery that is necessary to equip the parties for meaningful settlement negotiations;

(5) Describe the history and status of any settlement negotiations; and

(6) Include copies of documents out of which the suit arose (e.g., contracts), or whose availability would materially advance the purposes of the evaluation session, (e.g., medical reports or documents by which special damages might be determined).

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997. Renumbered, eff. May 1, 2000.

## RULE 5–9.  SPECIAL PROVISIONS FOR PATENT, COPYRIGHT, OR TRADEMARK CASES

(a) **Patent Cases.** A party who bases a claim on a patent shall attach to its written statement a Claim Chart under the Court's local rules for patent cases, if made, or an element-by-element analysis of the relationship between the applicable claims in the patent and the allegedly infringing product. Also the party shall describe in its written statement its theory or theories of damages and shall set forth all available information that supports each theory. A party who asserts a defense against the patent based on "prior art" shall attach an Initial Disclosure of Asserted Claims and Prior Art or Response Chart under the Court's local rules for patent cases, if made, or an exhibit that identifies each known example of alleged prior art and that describes the relationship between each such example of prior art and the claims of the patent. In addition, if such party denies infringement, it shall describe the basis for such denial.

(b) **Copyright Cases.** A party who bases a claim on copyright shall include as exhibits the copyright registration and exemplars of both the copyrighted work and the allegedly infringing work, and shall make a systematic comparison showing points of similarity. Such party shall also present whatever direct or indirect evidence it has of copying, and shall indicate whether it intends to elect statutory or actual damages. Each party in a copyright case who is accused of infringing shall set forth in its written statement the dollar volume of sales of and profits from the allegedly infringing works that it and any entities for which it is legally responsible have made.

(c) **Trademark Cases.** A party who bases a claim on trademark or trade dress infringement, or on other unfair competition, shall include as an exhibit its registration, if any, exemplars of both its use of its mark and use of the allegedly infringing mark, both including a description or representation of the goods or services on or in connection with which the marks are used, and any evidence it has of actual confusion. If "secondary meaning" is in issue, such a party shall also describe the nature and extent of the advertising it has done with its mark and the volume of goods it

has sold under its mark. Both parties shall describe in their evaluation statements how the consuming public is exposed to their respective marks and goods or services, including, if available, photographic or other demonstrative evidence. Each party in a trademark or unfair competition case who is accused of infringement shall set forth the dollar volume of sales of and profits from goods or services bearing the allegedly infringing mark.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 5–10. ATTENDANCE AT SESSION

(a) **Parties.** All named parties and their counsel are required to attend the ENE session unless excused under paragraph (d), below. This requirement reflects the Court's view that the principal values of ENE include affording litigants opportunities to articulate directly to other parties and a neutral their positions and interests and to hear, first hand, both their opponent's version of the matters in dispute and a neutral assessment of the merits of the case and the relative strengths of each party's legal positions.

(1) *Corporation or Other Entity.* A party other than a natural person (e.g., a corporation or an association) satisfies this attendance requirement if represented by a person (other than outside counsel) who has authority to settle and who is knowledgeable about the facts of the case.

(2) *Government Entity.* A unit or agency of government satisfies this attendance requirement if represented by a person who has, to the greatest extent feasible, authority to settle, and who is knowledgeable about the facts of the case, the governmental unit's position, and the procedures and policies under which the governmental unit decides whether to accept proposed settlements. If the action is brought by the government on behalf of one or more individuals, at least one such individual also shall attend.

(b) **Counsel.** Each party shall be accompanied at the ENE session by the lawyer who will be primarily responsible for handling the trial of the matter.

(c) **Insurers.** Insurer representatives are required to attend in person unless excused under paragraph (d), below, if their agreement would be necessary to achieve a settlement.

(d) **Request to be Excused.** A person who is required to attend an ENE session may be excused from attending in person only after a showing that personal attendance would impose an extraordinary or otherwise unjustifiable hardship. A person seeking to be excused must submit, no fewer than 15 days before the date set for the session, a letter to the ADR Magistrate Judge, simultaneously copying the ADR Unit, all counsel and the evaluator. The letter shall:

(1) Set forth all considerations that support the request;

(2) State realistically the amount in controversy in the case;

(3) Indicate whether the other party or parties join in or object to the request, and

(4) Be accompanied by a proposed order.

(e) **Participation by Telephone.** A person excused from appearing in person at an ENE session shall be available to participate by telephone.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 5–11. PROCEDURE AT ENE SESSION

(a) **Components of ENE Session.** The evaluator shall:

(1) Permit each party (through counsel or otherwise), orally and through documents or other media, to present its claims or defenses and to describe the principal evidence on which they are based;

(2) Help the parties identify areas of agreement and, where feasible, enter stipulations;

(3) Assess the relative strengths and weaknesses of the parties' contentions and evidence, and explain carefully the reasoning that supports these assessments;

(4) Estimate, where feasible, the likelihood of liability and the dollar range of damages;

(5) Help the parties devise a plan for sharing the important information and/or conducting the key discovery that will equip them as expeditiously as possible to enter meaningful settlement discussions or to position the case for disposition by other means;

(6) Help the parties assess litigation costs realistically; and

(7) If the parties are interested, help them, through private caucusing or otherwise, explore the possibility of settling the case;

(8) Determine whether some form of follow up to the session would contribute to the case development process or to settlement.

(b) **Process Rules.** The session shall be informal. Rules of evidence shall not apply. There shall be no formal examination or cross-examination of witnesses and no recording of the presentations or discussion shall be made.

(c) **Evaluation and Settlement Discussions.** If all parties stipulate, they may proceed to discuss settlement after the evaluation has been written but before it is presented. The evaluation shall be presented orally on demand by any party.

Eff. Sept. 1, 1995. Renumbered and amended, eff. May 1, 2000.

## RULE 5-12. CONFIDENTIALITY

(a) **Confidential Treatment.** Except as provided in subdivision (b) of this local rule, this court, the evaluator, all counsel and parties, and any other persons attending the ENE session shall treat as "confidential information" anything that happened or was said, any position taken, and any view of the merits of the case formed by any participant in connection with any ENE session. "Confidential information" shall not be:

(1) disclosed to anyone not involved in the litigation;

(2) disclosed to the assigned judge; or

(3) used for any purpose, including impeachment, in any pending or future proceeding in this court.

(b) **Limited Exceptions to Confidentiality.** This rule does not prohibit:

(1) disclosures as may be stipulated by all parties and the evaluator;

(2) a report to or an inquiry by the ADR Magistrate Judge pursuant to ADR L.R. 2-4(a) regarding a possible violation of the ADR Local Rules;

(3) the evaluator from discussing the ENE session with the court's ADR staff, who shall maintain the confidentiality of the ENE session;

(4) any participant or the evaluator from responding to an appropriate request for information duly made by persons authorized by the court to monitor or evaluate the court's ADR program in accordance with ADR L.R. 2-6; or

(5) disclosures as are otherwise required by law.

(c) **Confidentiality Agreement.** The evaluator may ask the parties and all person attending the ENE session to sign a confidentiality agreement on a form provided by the court.

### Commentary

Ordinarily, as with mediation, anything that happened or was said in connection with an ENE session is confidential. See, e.g., Fed. R. Evid. 408; Cal. Evid. Code Sections 703.5 and 1115–1128. The law may provide some limited circumstances in which the need for disclosure outweighs the importance of protecting the confidentiality of an ENE session. E.g., threats of death or substantial bodily injury (see Or. Rev. Stat. Section 36.220(6)); use of mediation to commit a felony (see Colo. Rev. Stat. Section 13–22–307); right to effective cross examination in a quasi-criminal proceeding (see *Rinaker v. Superior Court*, 62 Cal.App.4th 155 (3d Dist. 1998)); lawyer duty to report misconduct (see *In re Waller*, 573 A.2d 780 (D.C. App. 1990)); need to prevent manifest injustice (see Ohio Rev. Code Section 2317.023(c)(4)). Accordingly, after application of legal tests which are appropriately

sensitive to the policies supporting the confidentiality of ENE proceedings, the court may consider whether the interest in ENE confidentiality outweighs the asserted need for disclosure. See amended opinion in *Olam v. Congress Mortgage Company*, 68 F. Supp. 2d 1110 (N.D. Cal. 1999).

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997. Renumbered and amended, eff. May 1, 2000.

## RULE 5-13. FOLLOW UP

(a) **Discussion at Close of ENE.** At the close of the ENE session, the evaluator and the parties shall discuss whether it would be beneficial to schedule any follow up to the session.

(b) **Follow Up the Evaluator May Order.** The evaluator may order these kinds of follow up without stipulation:

(1) Responses to settlement offers or demands;

(2) A focused telephone conference;

(3) Exchanges of letters between counsel addressing specified legal or factual issues; or

(4) Written or telephonic reports to the evaluator, e.g., describing how discovery or other events occurring after the ENE session have affected a party's analysis of the case or position with respect to settlement.

(c) **Stipulation to Follow Up Session.** With the consent of all parties, the evaluator may schedule one or more follow up ENE sessions that may include additional evaluation, settlement discussions, or case development planning.

(d) **Limitations on Authority of Evaluator.** Evaluators have no authority to compel parties to conduct or respond to discovery or to file motions. Nor do evaluators have authority to determine what the issues in any case are, to impose limits on parties' pretrial activities, or to impose sanctions.

Eff. Sept. 1, 1995. Renumbered, eff. May 1, 2000.

## RULE 5-14. CERTIFICATION OF SESSION

Within 10 days of the close of each ENE session, and on the form Certification of Session provided by the Court, the evaluator shall report to the ADR Unit: the date of the session, whether any follow up is scheduled, whether the case settled in whole or in part, and any stipulations the parties agree may be disclosed. The ADR Unit will file the certification.

Eff. Sept. 1, 1995. Renumbered, eff. May 1, 2000.

# RULE 6.   MEDIATION

## RULE 6–1.   DESCRIPTION

Mediation is a flexible, non-binding, confidential process in which a neutral person (the mediator) facilitates settlement negotiations. The mediator improves communication across party lines, helps parties articulate their interests and understand those of their opponent, probes the strengths and weaknesses of each party's legal positions, identifies areas of agreement and helps generate options for a mutually agreeable resolution to the dispute. The mediator generally does not give an overall evaluation of the case. A hallmark of mediation is its capacity to expand traditional settlement discussion and broaden resolution options, often by exploring litigant needs and interests that may be formally independent of the legal issues in controversy.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

## RULE 6–2.   ELIGIBLE CASES

Subject to the availability of administrative resources and of a suitable mediator, appropriate civil cases may be referred to mediation by order of the assigned Judge following a stipulation by all parties, on motion by a party under Civil L.R. 7, or on the Judge's initiative.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

## RULE 6–3.   MEDIATORS

(a) **Appointment.** After entry of an order referring a case to mediation, the ADR Unit will appoint from the Court's panel a mediator who is available during the appropriate period and has no apparent conflict of interest. The Court will notify the parties of the appointment. The rules governing conflicts of interest and the procedure for objecting to a mediator on that basis are set forth in ADR L.R. 2–5(d).

(b) **Compensation.** Mediators shall volunteer their preparation time and the first four hours in a mediation. After four hours of mediation, the mediator may either (1) continue to volunteer his or her time or (2) give the parties the option of concluding the procedure or paying the mediator for additional time at an hourly rate of $200. The procedure will continue only if all parties and the mediator agree. After eight hours in one or more mediation sessions, if all parties agree, the mediator may charge his or her hourly rate or such other rate that all parties agree to pay. In special circumstances for complex cases requiring substantial preparation time, the parties and the mediator may make other arrangements with the approval of the ADR Director or ADR Program Counsel. No party may offer or give the mediator any gift.

(c) **Payment.** All terms and conditions of payment must be clearly communicated to the parties. The parties may agree to pay the fee in other than equal portions. The parties shall pay the mediator directly. On a form questionnaire provided by the Court, the mediator shall promptly report to the ADR Unit the amount of any payment received.

Eff. Sept. 1, 1995.  As amended, eff. July 1, 1997; May 1, 2000.

## RULE 6–4.   TIMING AND SCHEDULING THE MEDIATION

(a) **Scheduling by Mediator.** Promptly after being appointed to a case, the mediator shall arrange for the pre-mediation conference under ADR L.R. 6–6 and, after consulting with all parties, shall fix the date and place of the mediation within the deadlines set by paragraph (b) below, or the order referring the case to mediation. Counsel shall respond promptly to and cooperate fully with the mediator with respect to scheduling the pre-session phone conference and the mediation session.

(b) **Deadline for Conducting Mediation.** Unless otherwise ordered, the mediation shall be held within 90 days after the initial Case Management Conference or issuance of the initial case management order, whichever occurs first.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

## RULE 6–5.   REQUEST TO EXTEND THE DEADLINE

(a) **Motion Required.** Requests for extension of the deadline for conducting a mediation shall be made no later than 15 days before the session is to be held and shall be directed to the assigned Judge, in a motion under Civil L.R. 7, with a copy to the other parties, the mediator (if appointed) and the ADR Unit.

(b) **Content of Motion.** Such motion shall:

(1) Detail the considerations that support the request;

(2) Indicate whether the other parties concur in or object to the request; and

(3) Be accompanied by a proposed order setting forth a new deadline by which the mediation shall be held.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

## RULE 6–6.   TELEPHONE CONFERENCE BEFORE MEDIATION

The mediator shall schedule a brief joint telephone conference with counsel before the mediation session

to discuss matters such as the scheduling of the mediation, the procedures to be followed, the nature of the case, and which client representatives will attend.

Eff. Sept. 1, 1995.

# RULE 6-7.   WRITTEN MEDIATION STATEMENTS

(a) **Time for Submission.** No later than 10 calendar days before the first mediation session, each party shall submit directly to the mediator, and shall serve on all other parties, a written Mediation Statement.

(b) **Prohibition Against Filing.** The statements shall not be filed and the assigned Judge shall not have access to them.

(c) **Content of Statement.** The statements shall be concise, may include any information that may be useful to the mediator, and shall:

(1) Identify, by name and title or status:

(A) The person(s) with decision-making authority, who, in addition to counsel, will attend the mediation as representative(s) of the party, and

(B) Persons connected with a party opponent (including an insurer representative) whose presence might substantially improve the utility of the mediation or the prospects for settlement;

(2) Describe briefly the substance of the suit, addressing the party's views of the key liability issues and damages and discussing the key evidence;

(3) Identify the discovery or motions that promise to contribute most to equipping the parties for meaningful settlement negotiations;

(4) Describe the history and current status of any settlement negotiations and provide any other information about any interests or considerations not described elsewhere in the statement that might be pertinent to settlement; and

(5) Include copies of documents likely to make the mediation more productive or to materially advance settlement prospects.

Eff. Sept. 1, 1995.  As amended, eff. July 1, 1997; May 1, 2000.

# RULE 6-8.   CONTACT WITH MEDIATOR BEFORE THE MEDIATION

Before the mediation, the mediator may ask each party to submit only to the mediator an additional confidential written statement or may discuss the case in confidence with a lawyer during a telephone conversation. The mediator shall not disclose any party's confidential communication without permission.

Eff. Sept. 1, 1995.

# RULE 6-9.   ATTENDANCE AT SESSION

(a) **Parties.** All named parties and their counsel are required to attend the mediation unless excused under paragraph (d), below. This requirement reflects the Court's view that the principal values of mediation include affording litigants opportunities to articulate directly to the other parties and a neutral their positions and interests and to hear, first hand, their opponent's version of the matters in dispute. Mediation also enables parties to search directly with their opponents for mutually agreeable solutions.

(1) *Corporation or Other Entity.* A party other than a natural person (e.g., a corporation or an association) satisfies this attendance requirement if represented by a person (other than outside counsel) who has authority to settle and who is knowledgeable about the facts of the case.

(2) *Government Entity.* A unit or agency of government satisfies this attendance requirement if represented by a person who has, to the greatest extent feasible, authority to settle, and who is knowledgeable about the facts of the case, the governmental unit's position, and the procedures and policies under which the governmental unit decides whether to accept proposed settlements. If the action is brought by the government on behalf of one or more individuals, at least one such individual also shall attend.

(b) **Counsel.** Each party shall be accompanied at the mediation by the lawyer who will be primarily responsible for handling the trial of the matter.

(c) **Insurers.** Insurer representatives are required to attend in person unless excused under paragraph (d), below, if their agreement would be necessary to achieve a settlement.

(d) **Request to be Excused.** A person who is required to attend a mediation may be excused from attending in person only after a showing that personal attendance would impose an extraordinary or otherwise unjustifiable hardship. A person seeking to be excused must submit, no fewer than 15 days before the date set for the mediation, a letter to the ADR Magistrate Judge, simultaneously copying the ADR unit, all counsel and the mediator. The letter shall:

(1) Set forth all considerations that support the request;

(2) State realistically the amount in controversy in the case;

(3) Indicate whether the other party or parties join in or object to the request, and

(4) Be accompanied by a proposed order.

(d)* **Participation by Telephone.** A person excused from appearing in person at a mediation shall be available to participate by telephone.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

* Probably should read "(e)".

## RULE 6–10. PROCEDURE AT MEDIATION

**(a) Procedure.** The mediation shall be informal. Mediators shall have discretion to structure the mediation so as to maximize the benefits of the process .

**(b) Separate Caucuses.** The mediator may hold separate, private caucuses with each side or each lawyer or, if the parties agree, with the clients only. The mediator may not disclose communications made during such a caucus to another party or counsel without the consent of the party who made the communication.

Eff. Sept. 1, 1995. As amended, eff. May 1, 2000.

## RULE 6–11. CONFIDENTIALITY

**(a) Confidential Treatment.** Except as provided in subdivision (b) of this local rule, this court, the mediator, all counsel and parties, and any other persons attending the mediation shall treat as "confidential information" anything that happened or was said, any position taken, and any view of the merits of the case formed by any participant in connection with any mediation. "Confidential information" shall not be:

(1) disclosed to anyone not involved in the litigation;

(2) disclosed to the assigned judge; or

(3) used for any purpose, including impeachment, in any pending or future proceeding in this court.

**(b) Limited Exceptions to Confidentiality.** This rule does not prohibit:

(1) disclosures as may be stipulated by all parties and the mediator;

(2) a report to or an inquiry by the ADR Magistrate Judge pursuant to ADR L.R. 2–4(a) regarding a possible violation of the ADR Local Rules;

(3) the mediator from discussing the mediation with the court's ADR staff, who shall maintain the confidentiality of the mediation;

(4) any participant or the mediator from responding to an appropriate request for information duly made by persons authorized by the court to monitor or evaluate the court's ADR program in accordance with ADR L.R. 2–6; or

(5) disclosures as are otherwise required by law.

**(c) Confidentiality Agreement.** The mediator may ask the parties and all persons attending the mediation to sign a confidentiality agreement on a form provided by the court.

### Commentary

Ordinarily, anything that happened or was said in connection with a mediation is confidential. See, e.g., Fed. R. Evid. 408; Cal. Evid. Code Sections 703.5 and 1115–1128. The law may provide some limited circumstances in which the need for disclosure outweighs the importance of protecting the confidentiality of a mediation. E.g., threats of death or substantial bodily injury (see Or. Rev. Stat. Section 36.220(6)); use of mediation to commit a felony (see Colo. Rev. Stat. Section 13–22–307); right to effective cross examination in a quasi-criminal proceeding (*see Rinaker v. Superior Court*, 62 Cal.App.4th 155 (3d Dist. 1998)); lawyer duty to report misconduct (*see In re Waller*, 573 A.2d 780 (D.C. App. 1990)); need to prevent manifest injustice (see Ohio Rev. Code Section 2317.023(c)(4)). Accordingly, after application of legal tests which are appropriately sensitive to the policies supporting the confidentiality of mediation proceedings, the court may consider whether the interest in mediation confidentiality outweighs the asserted need for disclosure. See amended opinion in *Olam v. Congress Mortgage Company*, 68 F. Supp. 2d 1110 (N.D. Cal. 1999).

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 6–12. FOLLOW UP

At the close of the mediation session, the mediator and the parties shall jointly determine whether it would be appropriate to schedule a follow up session. Such follow up could include, but need not be limited to, written or telephonic reports that the parties might make to one another or to the mediator, exchange of specified kinds of information, or another mediation session.

Eff. Sept. 1, 1995.

## RULE 6–13. CERTIFICATION OF SESSION

Within 10 days of the close of each mediation session and on the form Certification of Session provided by the Court, the mediator shall report to the ADR Unit: the date the session was held, whether the case settled in whole or in part, whether any follow up is scheduled, and any stipulations the parties agree may be disclosed. The ADR Unit will file the certification.

Eff. Sept. 1, 1995.

# RULE 7. SETTLEMENT CONFERENCES

## RULE 7–1. DESCRIPTION

In a settlement conference, a judicial officer, usually a Magistrate Judge, facilitates the parties' efforts to negotiate a settlement. Some settlement Judges use mediation techniques in the settlement conference to improve communication among the parties, probe barriers to settlement, and assist in formulating resolutions. A settlement Judge might articulate views about

the merits of the case or the relative strengths and weaknesses of the parties' legal positions.

Eff. Sept. 1, 1995.

## RULE 7-2. REFERRAL TO A SETTLEMENT CONFERENCE

The Court may refer a case to a settlement conference on its own initiative, on the request of a party, or upon stipulation of the parties. A settlement conference generally will be conducted by a Magistrate Judge, but in some limited circumstances may be conducted by a District Judge. Upon written stipulation of all parties, the assigned Judge, in the exercise of his or her discretion, may conduct a settlement conference.

Eff. Sept. 1, 1995.

## RULE 7-3. REQUEST OF A PARTY

For cases assigned to the ADR Multi-Option Program, at any time after the ADR phone conference, a party may file with the assigned Judge a request for a settlement conference, pursuant to Civil L.R. 7. In all other cases, a party may file such a request at any time after the action has been commenced. The parties may stipulate to a preference for one or more particular Magistrate Judges or District Judges. The Court will attempt to honor the preference, subject to intra-division needs and the availability of the Magistrate Judges and District Judges.

Eff. Sept. 1, 1995. As amended, eff. May 1, 2000.

## RULE 7-4. DIRECTIVES FROM THE SETTLEMENT JUDGE

Within any constraints fixed by the referring Judge, the settlement Judge shall notify the parties of the time and date of the settlement conference. The settlement Judge also shall notify the parties of his or her requirements for pre-conference submissions and for attendance at the settlement conference. The settlement Judge may order parties to attend. Unless the settlement Judge otherwise specifies, "attendance" at a settlement conference is governed by the following:

(a) **Corporation or Other Entity.** A party other than a natural person (e.g., a corporation or an association) satisfies this attendance requirement if represented by a person (other than outside counsel) who

has authority to settle and who is knowledgeable about the facts of the case.

(b) **Government Entity.** A unit or agency of government satisfies this attendance requirement if represented by a person who has, to the greatest extent feasible, authority to settle, and who is knowledgeable about the facts of the case, the governmental unit's position, and the procedures and policies under which the governmental unit decides whether to accept proposed settlements. If the action is brought by the government on behalf of one or more individuals, at least one such individual also shall attend.

(c) **Insurers.** Unless excused by the settlement Judge, insurer representatives are required to attend in person if their agreement would be necessary to achieve a settlement.

Eff. Sept. 1, 1995. As amended, eff. July 1, 1997; May 1, 2000.

## RULE 7-5. SETTLEMENT CONFERENCE CONFIDENTIALITY

(a) **Confidential Treatment.** Except as provided in subdivision (b) of this local rule, this court, the settlement judge, all counsel and parties, and any other persons attending the settlement conference shall treat as "confidential information" anything that happened or was said, any position taken, and any view of the merits of the case formed by any participant in connection with any settlement conference. "Confidential information" shall not be:

(1) disclosed to anyone not involved in the litigation;

(2) disclosed to the assigned judge; or

(3) used for any purpose, including impeachment, in any pending or future proceeding in this court.

(b) **Limited Exceptions to Confidentiality.** This rule does not prohibit:

(1) disclosures as may be stipulated by all parties;

(2) any participant or the settlement judge from responding to an appropriate request for information duly made by persons authorized by the court to monitor or evaluate the court's ADR program in accordance with ADR L.R. 2-6; or

(3) disclosures as are necessary to preserve the court's capacity to enforce lawful orders or to discipline contumacious conduct, or as are otherwise required by law.

Eff. Sept. 1, 1995. As amended, eff. May 1, 2000.

# RULE 8. OTHER ADR PROCESSES

## RULE 8-1. OTHER COURT ADR PROCESSES

(a) **Non-binding Summary Bench or Jury Trial.** A summary bench or jury trial is a flexible, non-

binding process designed to promote settlement in complex, trial-ready cases headed for protracted trials. The process provides litigants and their counsel with an advisory verdict after a short hearing in which

the evidence may be presented in condensed form, usually by counsel and sometimes through witnesses. This procedure, as ordinarily structured, provides the litigants an opportunity to ask questions and hear the reactions of the Judge or jury. The Judge's or jury's nonbinding verdict and reactions to the legal and factual arguments are used as bases for subsequent settlement negotiations. Parties considering a nonbinding summary trial are encouraged to contact the ADR Unit for assistance in structuring a summary trial tailored to their case.

**(b) Special Masters.** The Court may appoint special masters to serve a wide variety of functions, including, but not limited to: discovery manager, fact finder or host of settlement negotiations. Generally the parties pay the master's fees.

Eff. Sept. 1, 1995.

## RULE 8–2. PRIVATE ADR

There are numerous private sector providers of ADR services including arbitration, mediation, fact-finding, neutral evaluation and private judging. Private providers may be lawyers, law professors, retired Judges or other professionals with expertise in dispute resolution techniques. Virtually all private sector providers charge fees for their services. The Court does not ordinarily refer cases to private providers except on the stipulation of the parties. The assigned Judge will take appropriate steps to assure that a referral to private ADR does not result in an imposition on any party of an unfair or unreasonable economic burden.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

# HABEAS CORPUS LOCAL RULES

## RULE 2254.  HABEAS CORPUS LOCAL RULES

### RULE 2254–1.  TITLE

These are the Local Rules of Practice which govern petitions for writs of habeas corpus filed in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 2254. They should be cited as "Habeas L.R. ____ ." These rules are effective May 1, 2000 and shall govern habeas corpus actions pending or commenced on or after that date.

These rules are intended to supplement the "Rules Governing Section 2254 Cases in the United States District Courts." The Civil Local Rules of this Court are also applicable in these proceedings, except to the extent that they are inconsistent with these Habeas Corpus Local Rules. The application of these rules to a particular petition may be modified by the Judge to whom the petition is assigned.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

## I.  HABEAS CORPUS PETITIONS IN NON–CAPITAL CASES

### RULE 2254–2.  SCOPE

Habeas L.R. 2254–2 to 2254–10 shall apply to a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in a noncapital case, that is a petition attacking something other than a judgment imposing a penalty of death.

Eff. Sept. 1, 1995.  As amended, eff. May 1, 2000.

### RULE 2254–3.  FILING PETITION

**(a) Venue.** The following noncapital petitions for writs of habeas corpus shall be filed in this District:

(1) Petitions challenging the lawfulness of a conviction or sentence for which the petitioner was convicted and sentenced in the following counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, San Francisco, San Mateo, Santa Clara, Santa Cruz and Sonoma; or

(2) Petitions challenging the manner in which the sentence is being executed, such as loss of good time credits, where the petitioner is confined in an institu-

tion located in a county listed in Habeas L.R. 2254–3(a)(1) at the time the petition is filed.

**(b) Transfer of Venue.** If a petition is filed in this District which does not conform to Habeas L.R. 2254–3(a), venue shall be transferred to:

(1) the district of conviction or sentencing if the petition is challenging the conviction or sentence; or

(2) the district of confinement if the petition is challenging the manner in which the sentence is being executed.

**(c) Place for Filing.** Noncapital petitions as to which venue lies in this District shall be filed in San Francisco.

**(d) Form and Content.** Noncapital petitions shall be filed on a form supplied by the Clerk, and shall be filled in by printing or typewriting. In the alternative, the petition may be in a typewritten, word-processed or other legible written form which contains all of the information required by the Court's form.

**(e) Pro Se Petitions.** Noncapital petitions filed by persons who are appearing pro se shall be on a form

# EXHIBIT F

## Jedediah Wakefield

**From:**   Vonnah Brillet [brilletlaw@yahoo.com]
**Sent:**   Tuesday, May 27, 2008 3:51 PM
**To:**     Jedediah Wakefield
**Subject:** Re: Filed Copy of Your Declaration

Dear Jed:


Thank you for the copy. This is in keeping with our conversation. I could have worded it differently to avoid any confusion, but I hope our conversation clarified any issues.


Thanks,

**Vonnah M. Brillet, Esq.**
**LAW OFFICE OF VONNAH M. BRILLET**
**2777 Alvarado Street, Suite E**
**San Leandro, CA 94577**
**(510) 351-5345 Office**
**(510) 351-5348 Fax**


----- Original Message ----
From: Jedediah Wakefield <JWakefield@Fenwick.com>
To: brilletlaw@yahoo.com
Sent: Tuesday, May 27, 2008 3:07:57 PM
Subject: Filed Copy of Your Declaration

Dear Vonnah:

Further to our conversation on the subject, attached is a copy of your final declaration as filed in the *Yue v. StorageTek* case.

Regards,

Jed

*******************************
Jedediah Wakefield
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
phone: 415.875.2331
fax: 415.281.1350
email: jwakefield@fenwick.com
-------------------------------------------

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Fenwick & West LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue

6/3/2008

Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.
--------------------------------------------

ATTENTION:
The information contained in this message may be legally privileged and confidential.  It is intended to be read only by the individual or entity to whom it is addressed or by their designee. If the reader of this message is not the intended recipient, you are on notice that any distribution of this message, in any form, is strictly prohibited.

If you have received this message in error, please immediately notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and delete or destroy any copy of this message.